# Commonwealth of Pennsylvania, Appellant, *v.* Samuel S. Brown.

*Constitutional law—Mines and mining—Statutes—Act of July* 15, 1897, *is unconstitutional.*

The Act of July 15, 1897, P. L. 286, entitled " an act requiring the weighing of bituminous coal before screening, and providing a penalty for the violation thereof," is unconstitutional, and there can be no valid indictment founded upon it.

It conflicts with the constitution, art. 1, sec. 9, of the Bill of Rights, and art. 1, sec. 1, of said Bill of Rights.

340  COMMONWEALTH v. BROWN.

Argued April 25, 1898. Appeal, No. 156, April T., 1898, by plaintiff, from judgment of Q. S. Allegheny Co., Sept. Sess., 1897, No. 975, finding defendant not guilty on special verdict. Before RICE, P. J., WICKHAM, REEDER, ORLADY, SMITH and PORTER, JJ. Affirmed.

Indictment charging defendant with violating act of July 15, 1897. Before FRAZER, J.

The facts sufficiently appear from the opinion of the court below as follows:

The indictment in this case charges the defendant with violating an act of assembly approved the 15th day of July, 1897, entitled "An act requiring the weighing of bituminous coal before screening, and providing a penalty for the violation thereof." The act provides as follows:

"Section 1. Be it enacted, etc., That it shall be unlawful for any mine owner, lessee or operator of any bituminous coal mine in this commonwealth, employing miners at bushel or ton rates, or other quantity, to pass the output of coal mined by said miners over any screen or other device which shall take any part from the weight, value or quantity thereof, before the same shall have been weighed and duly credited to the employee sending the same to the surface, and accounted for at the legal rate of weight fixed by the laws of the commonwealth.

"Sec. 2. Any owner, lessee or operator of any bituminous coal mine, violating the provisions of this act, shall be deemed guilty of a misdemeanor; and shall, upon conviction, for each and every such offense, be punished by a fine of not less than one hundred ($100) dollars nor more than five hundred ($500) dollars, or by imprisonment in the county jail for a period not to exceed ninety days, or by both such fine and imprisonment, at the discretion of the court; proceedings to be instituted in any court of competent jurisdiction.

"Sec. 3. All acts or parts of acts inconsistent herewith be and the same are hereby repealed."

Approved the 15th day of July, A. D. 1897.

At the trial of the case, the facts adduced by the testimony of the commonwealth were not disputed, and the jury rendered the following special verdict:

We, the jurors empaneled in this case, find the following facts :

1. That on the 24th day of September, 1897, the defendant, Samuel S. Brown, was the owner of a bituminous coal mine situate near the village of Boston, in the county of Allegheny, and as such owner, was, on the day aforesaid, engaged in the business of mining such coal.

2. That the defendant employed at his said mine a number of persons, including the prosecutor in this case, to dig and mine coal, at the rate of $2.47 per 100 bushels of coal mined. That on the day aforesaid the prosecutor mined and sent to the surface at said mine about 100 bushels of coal.

3. That the defendant caused the coal so mined and sent to the surface by the prosecutor in this case, at the mine aforesaid, to be passed over a screen which took from and reduced the weight, value or quantity of the coal so mined and sent to the surface about one eighth, before the same was weighed and duly credited to the prosecutor, and accounted for at the legal rate of weight fixed by the laws of this commonwealth.

4. The rate of $2.47 per 100 bushels referred to in the second paragraph was for lump coal remaining in screen after screening, and was the rate previously fixed by defendant for mining coal at said mine.

If the court should be of the opinion that the act under which the indictment in this case is drawn, viz : an act entitled " An act requiring the weighing of bituminous coal before screening, and providing a penalty for the violation thereof," approved the 15th day of July, A. D. 1897, is constitutional, and that the facts above stated, and the acts of the defendant above set forth are sufficient, in the opinion of the court, to warrant a conviction of the defendant for violating the provisions of the said act of assembly, then the jury do say, that the defendant is guilty of a misdemeanor in manner and form as he stands indicted. If the said act of assembly is not constitutional, or the facts as above stated are not sufficient, then the jury find the defendant not guilty.

The facts contained in the special verdict and the acts of the defendant are, in our opinion, sufficient to justify the defendant's conviction of violating the provisions of the above recited act, and if the act is constitutional we must enter a verdict of

guilty. The defendant claims that the act is unconstitutional and void: (1) because it conflicts with the constitution, article 1, section 9, of the Bill of Rights, which reads as follows: ". . . . nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land;" (2) because it conflicts with the constitution, article 1, section 1, of the Bill of Rights, which reads as follows: "All men are born equally free and independent and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness;" (3) because it conflicts with article 3, section 3, of the constitution, which reads as follows: "No bill except general appropriation bills shall be passed containing more than one subject, which shall be clearly expressed in the title;" (4) because it conflicts with article 3, section 7, of the constitution, which reads as follows: "The general assembly shall not pass any local or special law . . . . regulating labor, trade, mining or manufacturing."

The first and second objections to the constitutionality of the act involve to some extent the same principles, and will be considered together.

Does the act in question infringe upon the inherent and indefeasible rights of the citizen in enjoying liberty, acquiring property and pursuing happiness? Does it prevent him from exercising his own judgment in disposing of that which is his own, even though it does injure the rights of others?

The special verdict shows that the defendant was the owner of a bituminous coal mine, and as such owner was engaged in the business of mining bituminous coal; that he employed a number of persons to dig the coal at a fixed price per one hundred bushels of lump coal remaining in the screen after screening; that the rate to be paid and the manner of ascertaining the amount of coal to be paid for by defendant were known to the prosecutor and all other persons employed at said mine at the time of their employment, and were agreed to and accepted by the prosecutor and other employees at the time of their employment. These circumstances constituted a contract between the prosecutor and defendant to continue so long as the same proved to be mutually agreeable, and was binding on both.

But notwithstanding the contract which existed between the prosecutor and defendant, which we must presume was mutually advantageous and satisfactory to both, the act of assembly under which this indictment is drawn says to the prosecutor, you must terminate the existing contract with your employer and thereafter accept payment for the coal mined by you upon a different basis altogether, that the defendant must pay for the prosecutor's labor upon that new basis, without regard to whether the same is satisfactory or not to the parties, and if the defendant refuses to accede to the new basis, the law says he shall be guilty of a misdemeanor, and upon conviction, be fined or imprisoned or both.

The provisions of this act are unjust to both the employer and employee. They substantially prohibit both from exercising their constitutional rights to contract with regard to their own affairs. No matter how advantageous a contract, the miner may be able to make for himself to dig coal and receive payment for his labor upon a basis of the amount of screened coal mined, this act prevents the making of such a contract, by providing that the employer shall be criminally liable should he enter into such an agreement. The act is an attempt to deprive experienced persons who are familiar with all the details incident to the conducting and carrying on of a particular business from exercising their judgment as to what is best for their mutual advantage, and substitutes therefor the judgment of the members of the general assembly, a very small portion of whom have any knowledge or experience concerning that business. The members of the legislature were no doubt sincere and expected the act to benefit all persons engaged in mining bituminous coal for a living; on the contrary, however, the act is a reflection upon the intelligence of all men engaged in that business, and in addition thereto it attempts to deprive them of their liberty. We say liberty, because liberty includes the right to make contracts, and to acquire and enjoy property. Labor is property, and every laboring man has the indefeasible right to enter into any contract for the sale of his labor that in his opinion will be the most advantageous and remunerative to himself, provided he does not infringe upon the rights of others in so doing. The language of the Supreme Court, in passing upon what was known as the "Store Order Bill," is applicable

to this case. There the court said: "The first, second, third and fourth sections of the Act of June 29, 1881, P. L. 148 (Store Order Act), are utterly unconstitutional and void in as much as by them an attempt has been made by the legislature to do what in this country cannot be done; that is, prevent persons who are sui juris from making their own contracts. The act is an infringement alike of the rights of the employer and employee; more than this, it is an insulting attempt to put the laborer under a legislative tutelage, which is not only degrading to his manhood, but subversive of his rights as a citizen of the United States. He may sell his labor for what he thinks best, whether money or goods, just as his employer may sell his iron or coal, and any and every law that proposes to prevent him from so doing, is an infringement of his constitutional privileges, and consequently vicious and void:" Godcharles v. Wigeman, 113 Pa. 431.

In State v. Loomis, 115 Mo. 307, 319, in passing upon a "Store Order Bill," which was declared unconstitutional, the court says: "Liberty, as we have seen, includes the right to acquire property, and that means and includes the right to make and enforce contracts. . . . The constitutional declaration that no person shall be deprived of life, liberty or property without due process of law, was designed to protect and preserve their existing rights against arbitrary executive and judicial acts. The sections of our statute in question deprive a class of persons of the right to make and enforce ordinary contracts, and they introduce a system of state paternalism which is at war with the fundamental principles of our government."

And in State v. Goodwill, 33 W. Va. 179, the Supreme Court says: "The right to use, buy and sell property, including contracts of labor, which is, as we have seen, property, is protected by the constitution."

In Ramsey v. The People, 142 Ill. 380, the Supreme Court of that state declared an act almost similar in terms to the one now in question, unconstitutional. The Illinois act made it unlawful for any mine owner whose miners are paid upon a basis of the quantity of coal each shall mine and deliver to said employer, to take any portion of the same by any process of screening, or by any other device, without fully accounting for and

crediting the same to the miner from whose output such portion is screened or taken. The court says: "In all other kinds of business involving the employment of labor, the employer and employee are left free to fix by contract the amount of wages to be paid, and the mode by which such wages shall be ascertained and computed. This is justly regarded as a very important right vitally affecting the interests of both parties. To the extent to which it is abridged a property right is taken away. There is nothing in the business of coal mining which renders either the employer or employee less capable of contracting in respect to wages, than in any of the other numerous branches of business in which laborers are employed under analogous conditions. . . . Upon what principle then can those engaged in coal mining be singled out and subjected to restriction of their power to contract as to wages, while those engaged in all other classes of business are left entirely free to contract as they see fit? We think the attempt of the legislature to impose such restriction is clearly repugnant to the constitutional limitations which provide that no person shall be deprived of life, liberty or property without due process of law, and is, therefore, void."

A bill similar to the act in question in this case was presented to the Colorado legislature, and was referred to the Supreme Court of that state for an opinion as to its constitutionality. In reply to the legislature's request the Court said: "In so far as the bill attempts to abridge the right of contract between parties in regard to matters personal to themselves, and to deprive them of the power to fix the mode in which compensation for mining coal shall be ascertained, it is clearly an infringement of the constitutional guaranty that no man shall be deprived of life, liberty or property without due process of law:" In re House Bill No. 203, 21 Colo. 27.

There can be no doubt but the legislature may regulate the business of mining coal, so as to secure the safety and health of the miners, but that is not the object of the act in question. In this act they have singled out persons who are engaged in mining bituminous coal, and said to them, you cannot contract for your labor except in the manner provided by the act, any other manner being unlawful. The mechanic, glassworker, iron and steelworker, clerk or salesman, may each contract with

his employer upon such terms and conditions as he deems for his best advantage, but the man who mines bituminous coal for a livelihood must contract only in the manner provided by the act of July 15, 1897, as that act prohibits him from selling his labor in any other way, no matter what advantages a contract with different conditions would bring him. It will not do to say the act simply regulates wages; it does not do so; it denies to miners of bituminous coal the right to make and enforce an ordinary contract, a right which is possessed and exercised by every other class of workmen.

After carefully examining the act and the decisions of our courts bearing upon it, we are clearly of the opinion that the act of July 15, 1897, under which the indictment in this case is drawn, conflicts with the provisions of the constitution referred to in the first and second objections of defendant above quoted, and is therefore void. In view of the conclusion reached in the consideration of the first two objections, we deem it unnecessary to consider the others.

The act being unconstitutional, there can be no valid indictment founded upon it; therefore, a verdict of not guilty is now entered on the special verdict, and the defendant discharged. Plaintiff appealed.

*Errors assigned* were (1) in declaring the act of assembly approved the 15th day of July, A. D. 1897, unconstitutional and void. (2) In sustaining the first objection of the defendant, because it conflicts with the constitution, article 1, section 9, of the Bill of Rights. " Nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land." (3) In sustaining the second objection of the defendant to said act, because it conflicts with article 1, section 1 of the Bill of Rights. " All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." (4) In not entering judgment of guilty upon the special verdict found by the jury.

*W. J. Brennen,* with him *John C. Haymaker,* district attor-

ney, for appellant.—It is a canon of construction, "that all presumptions are in favor of the constitutionality of any act:" Craig v. Church, 88 Pa. 42; Water Co.'s Appeal, 148 Pa. 568; Railroad Co. v. Riblet, 66 Pa. 164.

It is the contention of the appellant that this act of assembly is a lawful exercise of the police power of the state, and that it is not in conflict with the Bill of Rights as decided by the court below: Powell v. Com., 114 Pa. 265; Powell v. Penna., 127 U. S. 678.

If it is determined by the legislative department, as they shall judge to be for the good and welfare of the commonwealth, that the system adopted in the bituminous coal regions for weighing and screening of coal is dishonest, then this act "must be a clear violation of the constitution—a clear usurpation of power prohibited." Otherwise it should stand: Powell v. The Commonwealth, 114 Pa. 265.

We submit, finally, that this act, in view of the investigation of the legislative department of the state, and its finding of fraud and chicanery in the mining of bituminous coal, can rest upon the police power of the legislature, and that it does not abridge the right of contract.

The police power meaning the general power of the government to preserve and promote the public welfare, even at the expense of private rights: 18 Am. & Eng. Ency. of Law, 740; Cooley's Const. Lim. 572; 4 Black. Comm. 162.

In Commonwealth v. Perry, 155 Mass. 117, Justice HOLMES, considering in a dissenting opinion, a statute forbidding an employer to impose a fine or to withhold wages from an employee, said: "I suppose that act was passed because the operatives, or some of them, thought that they often were cheated out of part of their wages under a false pretense that the work done by them was imperfect. If their view was true, I cannot doubt that the legislature could deprive the employers of an honest tool which they were using for dishonest purpose, and I cannot pronounce the legislation void, since I know nothing about the matter one way or the other."

Yet how different from this, the act we are examining; the legislature investigated and passed this act as a remedy.

*W. B. Rodgers*, for appellee.—What we are concerned with

here is the constitutionality of this act. It was claimed by the defendant in the court below, and is claimed here, that this act is unconstitutional for four reasons:

1. It conflicts with art. 1, sec. 9, of the constitution, "Nor can he be deprived of his life, liberty or property unless by the judgment of his peers or the law of the land."

2. It conflicts with art. 1, sec. 1, "All men . . . . have certain inherent and indefeasible rights among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property."

3. It conflicts with art. 3, sec. 3, "No bill except general appropriation bills shall be passed containing more than one subject, which shall be clearly expressed in the title."

4. It conflicts with art. 3, sec. 7, "The general assembly shall not pass any local or special law . . . . regulating trade, mining or manufacturing."

The learned trial judge considered the first and second reasons together. His opinion leaves but little to add.

This kind of legislation has been universally condemned by the courts. To this act may well be applied the vigorous language of the Supreme Court in Godcharles & Co. v. Wigeman, 113 Pa. 431. "The act is an infringement alike of the rights of the employer and employee; more than this, it is an insulting attempt to put the laborer under a legislative tutelage which is not only degrading to his manhood, but subversive of his rights as a citizen of the United States."

OPINION BY RICE, P. J., October 10, 1898:

Prior to the passage of the Act of July 15, 1897, P. L. 286, the established method of mining in the district where the defendant operated was to pass the coal, when it reached the mine opening, over an inch and a half screen. Of course, the operator and the miner were at liberty to make such contract, both as to the mode of compensation and as to the rate, as they saw fit, but the usual mode was to pay the miner a certain sum per ton or bushel for the lump coal, which would pass over the screen, and nothing for the nut, slack and dust, which passed through. It is argued that this method of compensation was an incentive to the miner to do good work; because the better the miner the less the amount of his product that will pass

through the screen, and the greater the quantity of lump coal that will be realized by the employer. On the other hand, it is claimed, that under this system of fixing the wages of the miners, gross abuses were possible, and had actually grown up. It is asserted, that individual employers, while ostensibly paying their miners the price per ton of screened coal uniformly paid in the district, might, and actually did, obtain their labor for less, by the use of screens so constructed as to break the coal as it was dumped upon them, and to permit a larger proportion of nut coal to pass through than would pass through the ordinary inch and a half screens with flat bars. For this and other reasons, it was claimed, that this method of ascertaining the compensation of the miners was unreliable and often unfair, and, to remedy the supposed evil, the legislature declared it a misdemeanor punishable by fine and imprisonment, " for any mine owner, lessee or operator of any bituminous coal mine in this commonwealth, employing miners at bushel or, ton rates, or other quantity, to pass the output of coal mined by said miners over any screen or other device which shall take any part from the weight, value or quantity thereof, before the same shall have been weighed and duly credited to the employee sending the same to the surface, and accounted for at the legal weight fixed by the laws of the commonwealth:" Act of July 15, 1897, P. L. 286. The defendant was indicted under this act, and the jury returned a special verdict, in which they found, inter alia, that he employed the prosecutor to dig and mine coal at the rate of $2.47 per hundred bushels of lump coal remaining in the screen after screening. Under this contract it was the defendant's duty to credit the prosecutor with, and account to him for, all the coal that remained in the screen after screening, and for no more. This he did. But under the statute it was his duty, before screening it, to credit the prosecutor with, and account to him for, all the coal sent out by him. This he did not do. Hence the prosecution.

Whether we look only at the language of the act, or construe it in the light of the history of the legislation, as given by the commonwealth's counsel, it is sufficiently clear, that the intent of the legislature was to break up the existing system, and to substitute the weight of the unscreened coal for that of the screened coal as the basis upon which the miner's compensation was to be computed.

It is true the act does not undertake to fix the price per ton or bushel to be paid, and, perhaps, does not prevent the parties from agreeing that proper deductions may be made from the gross weight on account of that part of the product of the miner's labor which must be rejected as worthless. It nevertheless does abridge, in some degree at least, the right of the parties to fix by their agreement the mode in which the wages of the miner shall be ascertained and computed, and, viewing the law in its most favorable light, it does put upon the employer the burden of doing something which the parties did not see fit to require by their contract. The most important question in the case is, whether the legislature had power to enact such a law.

Authority is not wanting in support of the proposition that there are limitations on legislative power "which grow out of the essential nature of all free governments; implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name:" Citizens' Sav. & L. Assn. v. Topeka, 87 U. S. 655, 22 L. ed. 461. But in general, the spirit of the constitution must be found in the language employed; to justify a court in pronouncing an act of the legislature unconstitutional and void it must be able to vouch some exception or prohibition, clearly expressed, or necessarily implied. The limitations on legislative power which grow out of the essential nature of every free government will, for the most part, be found, on investigation, to be expressed or necessarily implied in the declaration of rights which was made in order, " that the general, great and essential principles of liberty and free government may be recognized and unalterably established." At any rate, it is not necessary in the present case to set up any limitation otherwise implied in order to sustain the judgment of the court below that this act is unconstitutional. Section 1, article 1, declares: "All men are born equally free and independent and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Section 9 of the same article declares that no person can "be deprived of his life, liberty or property unless by the judgment of his peers or

the law of the land." Section 7, article 3, declares as follows: "The general assembly shall not pass any local or special law .... regulating labor, trade, mining or manufacturing." Class legislation is not necessarily special legislation within the meaning of the last quoted section. Regulations which might be adapted to the mining of ·bituminous coal might be utterly unreasonable if applied to the mining of anthracite coal, and there is now no question as to the power of the legislature to recognize "fixed physical conditions and special requirements" in legislating concerning each: Durkin v. Kingston Coal Co., 171 Pa. 193; Com. v. Jones, 4 Pa. Superior Ct. 362. But legislation, which denies to one class of citizens the free right to contract, which is enjoyed by, and unalterably secured to, all other citizens, might well be characterized as special unless there be such differences as in the nature of things furnish a reasonable basis for separate laws and regulations: State v. Loomis, 115 Mo. 307; 21 L. R. A. 789, 804; Cooley's Const. Lim. (6th ed.) 484. And this is not a legislative question purely. Conceding, however, the general and unrestricted power of the legislature to define, regulate and limit the natural liberty of the citizen to contract, this legislation might possibly escape the criticism that it is special and local in its operation, upon the principle upon which Durkin v. Kingston Coal Co., and Com. v. Jones, were decided. But, while there is a difference of opinion as to the extent that the legislature may restrain the natural liberty of the citizen in this regard, no one has the hardihood in this day to contend, that there are no limitations on its power; which the courts are authorized to recognize and enforce. The legislature may declare the mode in which the contracts of parties shall be expressed and evidenced in order to be enforceable, it may deny validity to contracts of persons supposed to be incapable of contracting, as in the case of infants and insane persons, and to contracts contrary to good morals or public policy as in the case of gaming contracts and contracts in general restraint of trade; it may interfere to regulate the contracts of persons pursuing a public business or who have voluntarily devoted their property to a public use so that it has "become affected with a public interest:" Munn v. People, 94 U. S. 113, 24 L. ed. 77; in the exercise of the police power of the state it may enact laws in the interest of public morals, and to

protect the lives, health and safety of persons following specified callings, and thus indirectly interfere with freedom of contract. These and other illustrations that might be referred to, show that the right of the citizen to contract is not beyond legislative control, but it by no means follows that the instances in which the legislature may interfere are without exceptions or that the extent to which the legislature may go is unlimited by nothing but its own discretion, and its sense of constitutional obligations. Everything which may pass under the form of an enactment is not therefore to be considered the "law of the land" or "due process of law" within the meaning of the constitution: Dartmouth College v. Woodward, 4 Wheaton, 518. The design of the section in which these words are used, as well as of the first section, was to exclude arbitrary power from every branch of government—the legislative as well as the executive: Norman v. Heist, 5 W. & S. 171. "The words 'by the law of the land' as used in the constitution, do not mean a statute passed for the purpose of working the wrong. That construction would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense:" Taylor v. Porter, 4 Hill, 140; Cooley's Const. Lim. 431, etc. Not only is the right of property protected against arbitrary encroachments by the legislature, but also the right of contract necessarily involved in it. The general rule is, that private parties, able to contract and willing to contract, may freely make such contracts concerning their property or labor, not contrary to good morals or public policy, as they may deem for their best interests; the instances where the legislature may interfere to abridge or deny this valuable right are exceptional, and such interference must have some reason for their justification other than the mere judgment of the legislature that the contract is not for the best interests of one or the other of the parties to it. Judge COOLEY says upon this general subject: "The doubt might also arise whether a regulation made for any one class of citizens, entirely arbitrary in its character, and restricting their rights, privileges or legal capacities in a manner before unknown to the law, could be sustained notwithstanding its generality. Distinction in these respects must rest upon some reason upon which they can be defended—like the want of capacity in infants and insane persons; and if the legislature

should undertake to provide that persons following some specified lawful trade or employment should not have capacity to make contracts, or to receive conveyances, or to build such houses as others were allowed to erect, or in any other way to make such use of their property as was permissible to others, it can scarcely be doubted that the act would transcend the due bounds of legislative power, even though no constitutional provision could be pointed out with which it came in conflict.    To forbid an individual or a class the right to the acquisition or enjoyment of property in such manner as should be permitted to the community at large, would be to deprive them of liberty in particulars of primary importance to their 'pursuit of happiness;' and those who should claim a right to do so ought to be able to show a specific authority therefor, instead of calling upon others to show how and where the authority is negatived:" Cooley's Const. Lim. 484.

The right to acquire, possess and protect property includes the right to make reasonable contracts, which shall be under the protection of the law.    The word "liberty" as used in these constitutional declarations means more than freedom of locomotion.    It includes and comprehends among other things freedom of speech, the right of self defense against unlawful violence, the right to live and work where he will, to earn his livelihood in any lawful calling, to pursue any lawful trade or avocation, and to freely buy and sell as others may: Story, Const. (5th ed.) sec. 1590; State v. Loomis, supra; People v. Gillson, 109 N. Y. 389.    These rights are held subject to such restraints as may be necessary for the common welfare, and of this the legislature, primarily, is the judge.    Its decision is not to be overturned by the courts upon the mere ground that the legislature is unwise or even unjust.    But where one class of citizens is singled out and denied the rights which others enjoy the courts may unquestionably interfere unless the purpose to be accomplished by the legislature is a public one.    This is not always an easy question to be determined and hence the courts refuse to interfere except in plain cases.    Nevertheless the power exists and a corresponding duty is imposed.

We have been referred to the usury laws as resting on a principle analagous to that invoked in the present case.    But is any one prepared to pursue the analogy to its logical conclusion and

say that under the police power—broad as it undoubtedly is—the legislature may decree what wages the laborer shall receive, as it may fix the rate of interest? The truth is, that when the history of the usury laws is understood it will be seen, that there is no analogy between them and a law regulating the rate of compensation for labor, or the basis upon which it shall be ascertained and computed. The language of Mr. Justice FIELD, giving the origin of these laws, although contained in a dissenting opinion, may be appropriately quoted in this connection. He says: " The practice of regulating by legislation the interest receivable for the use of money, when considered with reference to its origin, is only the assertion of a right of the government to control the extent to which a privilege granted by it may be exercised and enjoyed. By the ancient common law it was unlawful to take any money for the use of money; all who did so were called usurers, a term of great reproach, and were exposed to the censure of the Church; and if, after the death of a person, it was discovered that he had been a usurer whilst living his chattels were forfeited to the king, and his lands escheated to the lord of the fee. No action could be maintained on any promise to pay for the use of money, because of the unlawfulness of the contract. Whilst the common law thus condemned all usury, parliament interfered and made it lawful to take a limited amount of interest. It was not upon the theory that the legislature could arbitrarily fix the compensation which one could receive for the use of property, which, by the general law, was the subject of hire for compensation, that parliament acted, but in order to confer a privilege which the common law denied. The reasons which led to this legislation originally have long since ceased to exist; and if the legislation is still persisted in, it is because long acquiescence in the exercise of a power, especially where it was rightfully assumed in the first instance, is generally received as sufficient evidence of its continued lawfulness. 10 Bac. Abr. 264:" Munn v. People, supra.

The constitutionality of statutes restricting freedom of contract as between masters and servants is a subject which has received exhaustive consideration in many recent cases, and the conclusions so well stated by the learned judge delivering the opinion of the court below have generally been sustained, at least as applied to natural persons. In addition to the cases

cited by him—Godcharles v. Wigeman, 113 Pa. 431; State v. Loomis, 115 Mo. 307, 319; 21 L. R. A. 789; State v. Goodwill, 33 W. Va. 179; Ramsey v. People, 142 Ill. 380; 17 L. R. A. 853; In re House Bill No. 203, 21 Colo. 27—we may mention, State v. Fire Creek Coal & Coke Co., 33 W. Va. 188; 6 L. R. A. 359; Millett v. People, 117 Ill. 294; Frorer v. People, 141 Ill. 171; 16 L. R. A. 492; Com. v. Perry, 155 Mass. 117; 14 L. R. A. 325. See also for an exceedingly exhaustive review of the cases bearing upon the question, Leep v. St. Louis R. Co., 58 Ark. 407; 23 L. R. A. 264.

It was held in Godcharles v. Wigeman, supra, that the first four sections of the "Store Order Act" of June 29, 1881, P. L. 147, attempted to prevent persons who were sui juris from making their own contracts, and were "an infringement alike of the right of the employer and the employee," and therefore unconstitutional and void. Substantially the same view of similar enactments was taken in State v. Loomis, supra, where the whole subject was exhaustively considered, and State v. Goodwill, supra. It is fair to say that a different view was taken in Hancock v. Yaden, 121 Ind. 366.

In State v. Fire Creek Coal & Coke Co., supra, it was held that an act which prohibited persons and corporations engaged in mining and manufacturing and interested in selling merchandise and supplies, from selling any merchandise or supplies to their employees at a greater per cent of profit than they sell to others not employed by them was unconstitutional and void because it was class legislation, and an unwarranted interference with private contracts and business.

In Frorer v. People, supra, it was held that a statute making it unlawful for a person or corporation engaged in mining or manufacturing to engage or be interested in keeping or controlling any truck store, shop or scheme for furnishing supplies, tools, clothing, provisions or groceries to employees, but which did not apply to those employing laborers in other branches of business, violated the constitutional guaranty that no person shall be deprived of life, liberty or property without due process of law.

The statute under consideration in Millett v. People, supra, required all coal produced in the state to be weighed on scales to be furnished by the mine owners, and subjected them to fine

and imprisonment for failure to comply with its provisions. Another section declared all contracts for mining coal in which the weighing of coal, as thus provided for, should be dispensed with, to be null and void. The defendant being indicted for a violation of the statute set up as a defense that he had contracted with his miners for fixing their compensation otherwise than upon the basis of the weight of the coal mined. The judgment of conviction was reversed upon the ground that the provision declaring such contracts void was repugnant to the constitutional provision that "no person shall be deprived of life, liberty or property without due process of law."

In Commonwealth v. Perry, supra, a statute making it an offense punishable by fine for an employer to withhold wages from an employee engaged in weaving for any imperfections in the weaving was held to be in violation of a constitutional provision which enumerates among the natural and inalienable rights of men the rights of acquiring, possessing, and protecting property, as this right includes the right to make reasonable contracts which shall be under the protection of the law.

The Illinois act construed in Ramsey v. People did not differ in any material particular from the one under consideration. It was held to be repugnant to the constitutional provisions referred to in Millett v. People, supra, and Frorer v. People, supra, because it attempted to take away without due process of law the property right of contracting in respect to wages.

To the same effect was the opinion of the Supreme Court of Colorado, upon a bill containing similar provisions: In re House Bill No. 203, supra.

The criticism has been made, although not in this case, that the courts are too much inclined to deal with questions of this character in the abstract, and do not sufficiently regard those special conditions which give one class an undue advantage over the other and which can only be altered by legislation. We do not deem it necessary to enter into a discussion of the premises upon which such arguments are based, further than to express the opinion that it is well that the courts do deal with these questions with an eye single to the perpetuation of the great and essential principles of liberty and free government established by the constitution, rather than with a view to carrying out and enforcing their own notions as to the contracts

parties ought to make.   Every reason which has been suggested in defense of a law fixing the basis upon which the wages of bituminous coal miners shall be ascertained and computed might with as much force be urged in defense of a law fixing their wages outright.   Surely no one would contend that such a law could be sustained, but in real principle the conflict with the constitution is scarcely less apparent in the former case than it would be in the latter.

If one mine owner or operator sees fit to offer to pay his employees upon the basis of the weight of the lump coal remaining in the screen, because that will be an incentive to care and skill on the part of the miner, no substantial reason can be given for denying the parties the right to bind themselves by an agreement upon those terms.   If it is to the interest of another owner or operator to produce a greater proportion of nut coal, and he uses a screen adapted to that end, the parties being free to contract, and knowing the altered conditions, are at liberty to alter or abandon the basis of compensation or to increase the rate, or, if they cannot agree upon terms, to refuse to contract altogether.   The remedy under the general law, applicable to all classes of persons, is in their own hands, and we are not convinced that there is such inequality between these special classes of employees and employers as requires or justifies special legislative restriction of the liberty guaranteed to one as well as the other by the constitution.

For the reasons above given in connection with those set forth in the able opinion of the court below we think the case was correctly decided both upon principle and the great weight of authority.

Judgment affirmed.