Rohrer, Appellant, *v.* Milk Control Board.

282

Argued November 13, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*W. Hensel Brown,* of *Bard & Brown,* for appellant.

*Thomas Raeburn White,* with him *Richard C. Bull,* for Reeser's Milk Co., intervenor.

*W. F. Daniels,* Deputy Attorney General, with him *Charles Margiotti,* Attorney General, and *Harry Polikoff,* Special Deputy Attorney General, for appellee.

OPINION BY PARKER, J., March 16, 1936:

The Pennsylvania Milk Control Board, undertaking to act by authority of the "Milk Control Board Law" (Act of January 2, 1934, P. L. 174, 1933-34; 31 PS 684), fixed minimum prices to be paid for milk in this Commonwealth by dealers to producers, by dealers to other dealers, and by consumers to dealers and stores, and issued a general order establishing such minimum prices. Later the board, after hearing and by virtue of the provisions of the act, found that Wayne L. Rohrer, trading as Rohrer's Med-O Farms Dairy, had wilfully violated official general orders of the board by paying to his producers less than the minimum prices prescribed by those orders, the total of such under payments being $3,788.11, and ordered that on and after December 4, 1934, he should "cease and desist purchasing or handling milk in Pennsylvania for sale, shipment, storage, processing, or manufacture within and without Pennsylvania, or from operating in any other way in Pennsylvania, as a milk dealer." The respondent appealed from that order to the court of common pleas of Lancaster County which upheld the board, and he has now appealed to this court alleging as a reason for reversal that the act is unconstitutional.

The attack on the act is centered on that portion which provides for the fixing of a minimum price to be paid by dealers in milk, and it is urged that the provision is unconstitutional in four respects: (1) that the fixing of a maximum or minimum price for a commodity such as milk violates sections 1, 9, and 26 of Article I of

the Pennsylvania Constitution; (2) that the power given to the board to fix prices is an unlawful delegation of authority by the legislature to a commission; (3) that the act violates section 7 of Article III of our Constitution which forbids the passage of certain local and special legislation; and (4) that the title, in violation of section 3 of Article III, does not give notice of the power to fix prices.

The act in a preamble declares that due to certain unfair, unjust, destructive, etc., trade practices the dairy industry and the constant supply of pure milk are imperiled, and such conditions are a menace to the health, welfare, and reasonable comfort of the inhabitants of the Commonwealth; that the production, transportation, manufacture, processing, storage, distribution, and sale of milk in the Commonwealth "is a business affecting the public health and affected with a public interest"; that the "production and distribution of milk is a paramount industry upon which the prosperity of the Commonwealth in large measure depends"; that "the danger to the public health and welfare is immediate and impending," so that it will not admit of delay in public supervision and control; and that the act is an emergency measure. The act was made immediately effective and was to continue in force only until April 30, 1935, but with certain amendments or additions was later continued by the Act of April 30, 1935, P. L. 96 (31 PS 684). The act created a Milk Control Board of three members to be appointed by the Governor by and with the consent of the Senate, and the board is made an "instrumentality of the Commonwealth" for the purpose of administering the provisions of the act with power "to supervise and regulate the entire milk industry of this Commonwealth" and to establish reasonable trade practices and systems of production control, but does not alter or amend the Public Service Company Law or laws of the Commonwealth relating

to public health or the prevention of fraud or deception. It is authorized to adopt and enforce rules and regulations necessary to carry out the act, is given authority to enter and inspect the premises, books, and records of dealers in milk for the purpose of securing information and data, and then is required to fix minimum prices and *may* fix maximum prices to be paid by milk dealers, stores, and customers for milk. The violation of any provision of the act or any rule, regulation, or order of the board is made a misdemeanor with a penalty of fine and imprisonment. All dealers are required to obtain licenses which, under certain conditions, may be refused or revoked. This is but a brief outline of the act, and it will be necessary to refer more particularly to certain provisions as we discuss its various phases. One cannot read the Milk Control Act and the orders of the board issued pursuant thereto without coming to the definite conclusion that the primary purpose of the act in question is to fix prices.

It is a well recognized rule that a court will never heed objections to the constitutionality of an act of assembly unless the litigant is affected by the particular feature alleged to be in conflict with the Constitution. He must show that the alleged unconstitutional feature injures him and so operates as to deprive him of rights protected by the Constitution: Mesta Machine Co. v. Dunbar, 250 Pa. 472, 476, 95 A. 585; Plymouth Coal Co. v. Com. of Penna., 232 U. S. 531, 34 S. Ct. 359. We will therefore confine our attention to such features of the act as affect the appellant adversely.

1. The appellant first challenges the power of the legislature to fix a maximum or minimum price for a commodity such as milk, charging that the act in question violates the Bill of Rights as contained in the first article of the Constitution of this Commonwealth. In turn, the appellee contends that production, distribution, and sale of milk is such an industry as peculiarly

affects the public health and that the fixing of minimum and maximum prices is a legitimate exercise of the police power as a remedy intended to prevent the distribution and sale of impure milk, and also that the production, sale, and distribution of milk is a business affected with a public interest as that term is used in the cases.

The Supreme Court of this state and this court have heretofore in clear and vigorous language condemned price fixing except where the business considered was affected with a public interest. The legislature, by Act of June 29, 1881, P. L. 147, undertook to prescribe how operatives and laborers engaged in and about coal mines, iron and steel manufactories, and other manufactories should be paid their wages and the return which should be given them. The Supreme Court, in the case of Godcharles & Co. v. Wigeman, 113 Pa. 431, 437, 6 A. 354, held the first four sections of that act unconstitutional inasmuch as it was an attempt by the legislature "to do what, in this country, cannot be done; that is, prevent persons who are *sui juris* from making their own contracts." In that connection, Mr. Justice GORDON further said: "The Act is an infringement alike of the right of the employer and the employee; more than this, it is an insulting attempt to put the laborer under a legislative tutelage, which is not only degrading to his manhood, but subversive of his rights as a citizen of the United States. He may sell his labor for what he thinks best, whether money or goods, just as his employer may sell his iron or coal, and any and every law that proposes to prevent him from so doing is an infringement of his constitutional privileges, and consequently vicious and void."

In the case of Com. v. Brown, 8 Pa. Superior Ct. 339, the Act of July 15, 1897, P. L. 286, which required the weighing of bituminous coal before it was screened and duly credited to the employee sending the same to the surface, was under consideration. In holding the

act unconstitutional this court, in an opinion by that eminent jurist, President Judge RICE, said (p. 353) : "The right to acquire, possess and protect property includes the right to make reasonable contracts, which shall be under the protection of the law. The word 'liberty' as used in these constitutional declarations means more than freedom of locomotion. It includes and comprehends among other things freedom of speech, the right of self defense against unlawful violence, the right to live and work where he will, to earn his livelihood in any lawful calling, to pursue any lawful trade or avocation, and to freely buy and sell as others may ...... [p. 357] Every reason which has been suggested in defense of a law fixing the basis upon which the wages of bituminous coal miners shall be ascertained and computed might with as much force be urged in defense of a law fixing their wages outright. Surely no one would contend that such a law could be sustained, but in real principle the conflict with the Constitution is scarcely less apparent in the former case than it would be in the latter." The opinion of the lower court in that case written by Judge FRAZER, afterwards Chief Justice FRAZER, contains pertinent observations upon this subject. He there said (p. 343) : "We say liberty, because liberty includes the right to make contracts, and to acquire and enjoy property. Labor is property, and every laboring man has the indefeasible right to enter into any contract for the sale of his labor that in his opinion will be the most advantageous and remunertive to himself, provided he does not infringe upon the rights of others in so doing." If in a lawful exercise of the police power of the state the legislature does not have the power to fix wages, we cannot conceive of any theory upon which they have such power to fix maximum and minimum prices at which the price of such commodities as milk, meat, bread, and wheat may be

fixed. The laborer must have his wage before he can purchase milk or other necessity.

This principle is equally well settled in the federal jurisdiction. Mr. Justice SUTHERLAND, in the case of Williams v. Standard Oil Co., 278 U. S. 235, 239, 49 S. Ct. 115, said: "A state legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with a public interest.'" Also, see Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, 43 S. Ct. 630; Tyson & Bro. v. Banton, 273 U. S. 418, 427, 47 S. Ct. 426; Fairmont Creamery Co. v. Minnesota, 274 U. S. 1, 47 S. Ct. 506; Ribnik v. McBride, 277 U. S. 350, 48 S. Ct. 545.

We might therefore well rest our decision upon these cases. In fact, we would do so if it were not for the case upon which the appellee principally relies, Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505. The majority of this court are so impressed with the former decisions of our own courts, as well as those of the Supreme Court of the United States prior to the Nebbia case, that we are constrained to presume to distinguish the cases. That case deals with the Fourteenth Amendment to the federal Constitution and assumes that the Milk Control Act of New York is not violative of the Constitution of that state. We are engaged in the question at bar in a construction of our own Constitution, and so long as the federal Constitution is not involved we are bound by the decisions of our own Supreme Court (Act of June 24, 1895, P. L. 212, §10, 17 PS 198). The Fourteenth Amendment to the federal Constitution was not a limitation on the liberty of contract but rather a guarantee of it. Whether we accept the opinions of the majority or the minority in the Slaughterhouse Cases, 16 Wall. 36, and as considered in subsequent opinions of the United States Supreme Court dealing with the scope of the Fourteenth Amendment, it follows that we

are called upon to construe our own Constitution, and if we do not impinge upon rights guaranteed by the federal Constitution we are not concluded by decisions of the federal Supreme Court. The decisions of that court upon kindred matters are always entitled to the utmost respect and will always receive such consideration from our courts: Central Litho. Co. v. Eatmor Chocolate Co., 316 Pa. 300, 309, 175 A. 697. In fact, the general principle which we have stated is not questioned by the appellee.

Moreover, the statements in the Nebbia case, that "a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose," was expressly limited by the qualification that it was made only "so far as the requirement of due process is concerned and in the absence of other constitutional restriction." In this state we have a positive "constitutional restriction" upon the power of the legislature to interfere with the right of our citizens to make their own contracts.

Is the production, transportation, manufacture, processing, storage, distribution, and sale of milk a business "affected with a public interest"? We assume that this phrase has the limited meaning given to it in judicial decisions. Either the phrase means something more than that the public are concerned in respect to the maintenance of a business and have an interest in its effect on the public or the phrase is without meaning and all that has been said on the subject by the courts, federal and state, must be forgotten. The public welfare is affected by the conduct of any business. Considering the most ordinary relations of life, professional and industrial, the public are concerned in its success or failure as well as the manner in which it may be conducted. To say the general welfare alone furnishes a warrant for price fixing in the case of a purely private

business is to nullify the Bill of Rights as contained in our state Constitution. We consequently assume, and we think properly so, that the general welfare does not furnish a sufficient basis for every regulation to which a business might be subjected.

It is admitted on all sides that there is neither definition which precisely describes the phrase "affected with a public interest" nor formula which will identify the category in which a business should be placed, just as it has been impossible to construct a comprehensive definition of police power. The meaning of the phrase under consideration can only be approximated. The term is employed to describe a limited classification of businesses which, by reason of peculiar relations to the public or privileges granted by the state, are subject to a more extensive control than other businesses. Nevertheless, the control is exercised by virtue of the police power of the state, a power inherent in a government to enact laws necessary to promote order, safety, health, morals, and general welfare in some aspects, and an attribute of sovereignty which exists without any reservation in the Constitution, corresponding to the right of self preservation in the individual (Com. v. Vrooman, 164 Pa. 306, 30 A. 217). Sic utere tuo ut alienum non laedas. "It means that a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been *devoted* to a public use and its use thereby in effect *granted* to the public": Williams v. Standard Oil Co., supra (pp. 239, 240).

In Wolff Packing Co. v. Court of Industrial Relations, supra, Chief Justice Taft made the most accurate analysis that we have found. There the court subdivides businesses clothed with a public interest justifying public regulation into three classes: (1) Those carried on under the authority of a public grant or privileges expressly or impliedly imposing an affirma-

tive duty of rendering public service demanded by the public, such as common carriers and public utilities. (2) Occupations regarded as exceptional, the public interest attaching to which has been recognized from earliest times and has survived the period of arbitrary laws by Parliament or colonial legislatures for regulating trades and callings. In this class are inns, cabs, and grist mills. (3) Businesses which, though not public at their inception, have become such by devoting their business to a public use thereby granting the public an interest in that use and subjecting themselves to public regulation to the extent of that interest, although the property continues to belong to its private owner and to be entitled to protection accordingly. In this class are included public warehouses for storage of grain: Munn v. Illinois, 94 U. S. 113; Brass v. Stoeser, 153 U. S. 391, 14 S. Ct. 857; banks and banking: Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186; insurance: German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 S. Ct. 612; Com. v. Vrooman, supra; regulating the leasing of buildings in the District of Columbia sustained as an emergency measure: Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458. If the milk business is affected with a public interest it must be in the third class.

In addition to the deliverances of our own courts to which we have referred, the United States Supreme Court has indicated by many decisions prior to the Nebbia case that certain private businesses similar to the milk business are not affected with a public interest and therefore are not subject to price control, or that the remedy proposed is not so relevant to the evil attempted to be corrected that there is justification for disregard of the right of private contract by virtue of the police power, and particularly that the legislature may not prescribe minimum prices for wages and sales of commodities where a private business is concerned: Adkins

v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394; Wolff v. Court of Industrial Relations, supra; Tyson & Bro. v. Banton, supra; Fairmont Creamery v. Minnesota, supra; Ribnik v. McBride, supra; Williams v. Standard Oil Co., supra; New State Ice Co. v. Liebmann, 285 U. S. 262, 52 S. Ct. 371; Sterling v. Constantin, 287 U. S. 378, 53 S. Ct. 190.

"It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator, or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by state regulation": Wolff v. Court of Industrial Relations, supra, p. 537. In New State Ice Co. v. Liebmann, supra (p. 277), in construing the business of manufacturing and selling ice, the court described the ice business as one that is "as essentially private in its nature as the business of the grocer, the *dairyman*, the butcher, the baker, the shoemaker." (Italics supplied.)

We can think of no business that is more essentially private than that of producing and selling milk. The producer and dealer reserve the right to sell to whomever they choose at wholesale or retail, and at no stage of the transaction does the dealer in milk devote his property to a public use. His position is the same as that of a farmer, or the dealer in meat, bread, and clothing. If business is divided into two categories, one consisting of the merchant, shop keeper, butcher, and baker, and another intended to include such businesses as public utilities, railroads and common carriers, innkeepers, bankers, insurance companies, grain elevators, and the like, we would readily place the producer and dealer in milk in the former class. More particularly, the relation of the milk dealer to his customers is a private relation. He chooses the persons to whom he will sell and the customer has his favorite dealer, in marked

contrast to such businesses as utilities. We are of the opinion that the milk business is not affected with a public interest.

The Milk Control Board Law does not represent in any aspect an attempt to prevent a monopoly or unfair trade practices and we therefore refrain from discussing the right of the state to interfere with the use of private property by restrictions in such cases, but we note in passing that such practices and their effects have frequently had an important part in the justification of interference with liberty of contract both at common law and under written constitutions where such claims have been upheld.

Regardless of the classification in which we place the producer and dealer in milk, and admitting that in the exercise of the police power the business is subject to certain regulations, it does not follow that there are no limitations upon the remedy which may be applied. In fact, the remedy must bear a reasonable relation and be appropriate to the object to be accomplished. It must not be discriminatory or arbitrary. "On the other hand, 'to justify the State in interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means [employed] are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals; [that is to say] the legislature may not, under the guise of protecting the public interest, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations' (Lawton v. Steele, 152 U. S. 133, 137); and, in deciding whether or not a statute is a legal exercise of police power, courts are not bound by the mere form of the act, but will 'look at the substance of things': Mugler

v. Kansas, supra [123 U. S. 623], p. 661": Nolan v. Jones, 263 Pa. 124, 128, 106 A. 235.

It will be noted that the declaration in the preamble to the milk act is not that the supply of milk is imperiled, but the supply of *pure* milk. It is true that it is declared that the dairy industry is imperiled by existing conditions and those conditions are charged to various "unhealthful, unfair, unjust, destructive, demoralizing and uneconomic trade practices." That the production, transportation, and distribution of milk is a proper subject of regulation by the legislature under its police powers is indisputable, since every business is subject to some control. Milk is a fertile medium for the development of bacteria and sanitary regulations are clearly essential to the preservation of the public health. Liquid milk is a perishable commodity and can only be retained in a condition fit for human consumption for a short time. This is recognized in a long list of acts of assembly in this state providing regulations and rules looking to the accomplishment of that end, and such statutes have been upheld: Com. v. Crowl, 245 Pa. 554, 91 A. 922; Hill v. Fetherolf, 236 Pa. 70, 84 A. 677; Hoar v. Lancaster, 290 Pa. 117, 137 A. 664. At the same time the business of producing and selling milk is essentially a private business.

The legislature has heretofore, by innumerable acts covering a period from 1853 to 1935, prohibited the sale of impure and unwholesome milk and prescribed a host of regulations to insure such supply. A reference to the digest of our statutes (31 PS 521 to 660g) discloses that at present there are many laws in force intended to accomplish the same end and providing severe penalties which apply directly to the evils described in the preamble to the Milk Control Board Law. The right to enact such legislation prohibiting the sale of impure milk and furnishing safeguards for the public from the danger of an impure or unwholesome supply of milk is

well settled by judicial decisions. Now the legislature undertakes, under the guise of a health regulation, to fix the prices for the sale of milk in certain cases. (It will be noted that milk supplied directly by producer to consumer is not made subject to price regulation.) As we have seen, the fixing of prices for ordinary commodities, even necessities of life, has been condemned by our courts as unconstitutional and by the federal courts prior to the Nebbia case. We had remedies prior to the statute that we are considering that are comprehensive and constitutional and which, if enforced, will assure the public that the supply of milk be pure, but a remedy of totally different character is now proposed.

"Because abuses may, and probably do, grow up in connection with this business, is adequate reason for hedging it about by proper regulations. But this is not enough to justify destruction of one's right to follow a distinctly useful calling in an upright way. Certainly there is no profession, possibly no business, which does not offer peculiar opportunities for reprehensible practices; and as to every one of them, no doubt, some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skilfully directed agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the fundamental guaranties of the Constitution cannot be freely submerged if and whenever some ostensible justification is advanced and the police power invoked": Adams v. Tanner, 244 U. S. 590, 37 S. Ct. 662, 664.

When the legislature undertook to fix minimum and maximum prices for milk, this did not constitute a regulation to prevent an alleged evil but was an assumption of management, control, and dictation and "amounts to the deprivation of the fundamental right which one has to conduct his own affairs honestly and

along customary lines" (Dissenting Opinion of Mr. Justice McReynolds in Nebbia case, p. 555).

We can see no reasonable relation between the existing or portending evil in the milk industry and the establishing of a minimum price to be paid by dealer to producer and by consumer to dealer. On the other hand, it is apparent that the price fixing feature of this statute is purely of an economic character and an attempt to apply to one commodity a new social theory which is repugnant to our Constitution. The price fixing feature of this act, in the words of Nolan v. Jones, supra, is not reasonably necessary for the accomplishment of the purpose, is an arbitrary interference with private business, and imposes unusual and unnecessary restrictions upon a lawful business.

It is further urged by the appellee that an emergency exists and that this and other facts declared by the legislature to exist furnish a sufficient basis for the action taken. The first assertion is answered by many decisions of the courts, state and federal, and very recently in Schechter Poultry Corp. v. U. S., 295 U. S. 495, 528, 55 S. Ct. 837, 842, where it was said: "Extraordinary conditions may call for extraordinary remedies. But the argument necessarily stops short of an attempt to justify action which lies outside the sphere of constitutional authority. Extraordinary conditions do not create or enlarge constitutional power." In regard to the second proposition, there is equal unanimity. The mere declarations by the legislature that an emergency exists or that a particular kind of property or business is affected with a public interest is not conclusive upon the question of the validity of the regulation. The matter is one which is always open to judicial inquiry: Tyson & Bro. v. Banton, supra, p. 431; Wolff v. Court of Industrial Relations, supra; Producers' Transportation Co. v. R. R. Comm., 251 U. S. 228, 230, 40 S. Ct. 131.

The appellee, to support its contention that fixing a minimum price for milk has a reasonable relation to the necessity for a supply of pure milk, argues that the regulations which have been imposed on the milk industry have so added to the expense of production and distribution that those engaged in the business have failed to comply with the law and they must therefore be assured of a better price to preserve the quality of milk. Expressed in another way, it means that the laws are being violated and it is proposed to increase prices to the end that the producer and dealer may be persuaded to obey the law. It will require a sounder argument than that to justify the overriding of the constitutional guaranty of liberty of contract under the guise of police power. Those who would justify such an exercise of police power must show that it is *necessary* to do so for the security of social order, the preservation of life and health, or for reasons of like magnitude. We view the proposed remedy as part of a new social plan which is concerned with the public economy rather than the public health. We do not mean to intimate that the police power may not be concerned with certain phases of public economy, but the limits are different and the remedies must be appropriate. A reference to paragraph C of section 18 of the act makes clear the prime purpose of this act. It is declared "to be the legislative intent that the public emergency requires that the benefits of any increase of prices received by milk dealers by virtue of the minimum price provisions of this section shall be given to producers." The advantage of any increase of price is given exclusively to the producer, notwithstanding the fact that it is a matter of common knowledge that milk may become contaminated or unwholesome while in transportation or being handled by dealers or storekeepers. They, however, are to receive no part of the increase in price. This would seem to be a further indication that

the purpose of price fixing is primarily economic. While the wisdom of an act is not generally for the courts, the purposes and objects of the act have a very definite part in determining the propriety of a remedy.

We cannot close our eyes to the consequences that may follow if it is held that the legislature has a right to prescribe a minimum and a maximum price for milk. An adequate supply of wholesome meat, bread, the staff of life, wheat, farm produce, and groceries is definitely in the same class as milk. Clothing in our climate, as well as in our society, is a primary necessity. To go a step farther, an adequate supply of gasoline closely approaches that of food stuffs in its effect on society as it now exists. We are unable to see how any court can say that the legislature may fix a price to be charged by the milk dealer but may not fix a price to be charged by the baker and butcher, the farmer, groceryman, and dealer in clothing. If a change is to be made in the fundamental law of the Commonwealth so revolutionary as to hold that the legislature may fix maximum and minimum prices for milk, bread, and clothing, it does not lie within the powers of this court to make the change as the decisions of the Supreme Court of Pennsylvania are here binding upon us. It has heretofore been possible to draw an approximate line between those businesses which are affected with a public interest and those that are not, and again and again it has been held that price fixing is not a lawful remedy for the regulation of a purely private business. If we adopt the theory of the appellee, the reasoning by our own courts, as well as the federal courts, concerning businesses affected with a public interest is to be discarded and the legislature has the right, under the guise of promoting the public welfare, to enforce almost any economic policy which it declares to be wise and expedient.

About the time of the Revolution, bills of rights were

made a part of almost every state constitution in the union as it then existed, and after the adoption of the federal Constitution like restrictions were placed in that document. These were intended to establish the principle that there are rights in the people beyond the control of the State. It was intended that the lives, liberty, and property of the citizens should not be subject to the absolute disposition or unlimited control of any legislature, even the most democratic depository of power. "It is true it is a despotism of the many, of the majority, if you choose to call it so, but it is none the less a despotism ...... The theory of our government, state and national, is opposed to the deposit of unlimited power anywhere": Loan Assn. v. Topeka, 20 Wall. 655, 662.

There is a further objection to section 18. The early paragraphs of that section provided that the board shall ascertain what will be most beneficial to the public interest and will best protect the milk industry and shall consider all conditions affecting the industry, including an amount necessary to yield a reasonable return to the producer and the milk dealer. Assuming for the sake of argument that this is a standard for guidance of the board, nevertheless it is declared by subsection C that the benefits of any increase of price received by the milk dealers as a result of action by the board shall be given to the producers. Subsection C would seem to prevent the board from fixing a minimum price to be received by the dealer that would represent an increase in price so that the dealer's margin would be more than it had been before prices were fixed. The fixing of a minimum price to be paid by the dealer and a minimum to be paid by the consumer determines, in practical effect, the margin to be received by the dealer. In other words, notwithstanding any conditions that may exist or may arise the dealer is not to have his margin increased and that even though the public in-

terest, the improvement of the milk industry, or receiving a fair return would warrant a different price. We deem this to be an arbitrary and discriminatory provision that affects the entire section.

The majority of this court are of the opinion that the price fixing feature of the "Milk Control Board Law" is unconstitutional in that it is in violation of the Bill of Rights of the Constitution of this Commonwealth and that the price fixing feature of the act bears no reasonable or proximate relation to the securing of an adequate supply of pure milk, and is arbitrary and discriminatory.

2. The "Milk Control Board Law" is next attacked on the ground that the delegation of power to fix prices vested in the Milk Control Board was an unconstitutional delegation of authority by the legislature. This second proposition is predicated upon an assumption which is not admitted by appellant that a maximum or minimum price for milk may be fixed by the legislature acting directly or through an agency. The Constitution of this Commonwealth in Article II, section 1, provides: "The legislative power of this Commonwealth shall be vested in a General Assembly which shall consist of a Senate and a House of Representatives." This court recently (Gima v. Hudson Coal Co., 106 Pa. Superior Ct. 288, 296, 161 A. 903) had occasion to inquire into the history and scope of delegation of power by the legislature and we will not repeat what was there so well said by President Judge KELLER, but it will be necessary to make some further reference to the authorities insofar as they may throw light upon the immediate question involved, a delegation of power by the legislature. "Under a well-balanced constitution, the legislature can no more delegate its proper function than can the judiciary": Boro. of West Philadelphia, 5 W. & S. 281, 283. "The legislature cannot delegate its power to make a law; but it can make a

law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation": Locke's Appeal, 72 Pa. 491, 498.

In the Gima case the question involved was the constitutionality of an act affecting the anthracite mining industry where the legislature delegated the power to determine how certain high explosives should be used. We there said (p. 303) : "The General Assembly cannot be expected to enact laws which shall in themselves keep abreast of every advance of science and invention in the explosive line, any more than it can of itself determine when a working place is free of gas and fit to work in." The opinion then pointed out that a means had been established to determine the safe method to store, charge, fire, and use high explosives as well as a method of making known such determination. The opinion then continues: "In doing so, the General Assembly has legislated—not the powder manufacturer or coal operator—no legislative power or authority has been delegated to them."

In the federal jurisdiction the cases are in precise harmony with our own decisions. In the very recent case of Panama Refining Co. v. Ryan, 293 U. S. 388, 426, 55 S. Ct. 241, 251, Chief Justice HUGHES, speaking for the court, said: "Applying that principle, authorizations given by Congress to selected instrumentalities for the purpose of ascertaining the existence of facts to which legislation is directed have constantly been sustained. Moreover the Congress may not only give such authorizations to determine specific facts, but may establish primary standards, devolving upon others the

duty to carry out the declared legislative policy; that is, as Chief Justice MARSHALL expressed it, 'to fill up the details' under the general provisions made by the Legislature." "The Congress may not delegate its purely legislative power to a commission, but, having laid down the general rules of action under which a commission shall proceed, it may require of that commission the application of such rules to particular situations and the investigation of facts, with a view to making orders in a particular matter within the rules laid down by the Congress": Interstate Commerce Com. v. Goodrich Transit Co., 224 U. S. 194, 214, 32 S. Ct. 436, 441.

The case of J. W. Hampton, Jr., & Co. v. U. S., 276 U. S. 394, 48 S. Ct. 348, is peculiarly pertinent to the situation here involved as there was there delegated to the President, with the assistance of the United States Tariff Commission, power to fix tariffs subject to certain definite rules or standards to be employed in determining a proper rate to carry out the policy prescribed by the act. Four definite standards were provided by which the action of the President was to be guided, but Congress found it necessary to use officers of the executive branch within defined limits to secure the exact effect intended by its acts of legislation by vesting discretion in such officers to make findings and provide regulations. It was there said (p. 409) : "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power."

We will examine the powers delegated by the legislature in the Milk Control Board Law in the light of these decisions with a view to determining what primary standards have been established as a basis for the fixing of prices. The preamble discloses certain existing evils in the milk industry and the need of a whole-

some supply of pure milk, of an improvement in the milk industry, and of increasing the purchasing power of milk producers, but declares no policy and establishes no standard by which the price of milk is to be fixed. A Milk Control Board of three members to be appointed by the Governor is declared to be "the instrumentality of the Commonwealth for the purpose of administering the provisions" of the act, and it is given power to regulate "the entire milk industry," to investigate it in all its phases and secure data. Milk dealers are required to be licensed before they can buy, sell, or distribute milk and their licenses may be refused, revoked, or suspended for failure to comply with the provisions of the act. Section 18 provides: "A. The board shall ascertain, by such examination or investigation as the emergency may warrant, what prices for milk in the several localities and markets of the Commonwealth, and under varying conditions, will be most beneficial to the public interest and will best protect the milk industry in the Commonwealth and insure a sufficient quantity of pure and wholesome milk to adults and minors in the Commonwealth, having special regard to the health and welfare of children residing therein. The board shall take into consideration all conditions affecting the milk industry, including the amount necessary to yield a reasonable return to the producer and to the milk dealer. B. The board, after making such examination or investigation, shall fix, by official order, the minimum wholesale and retail prices, and may fix, by official order, the maximum wholesale and retail prices, to be charged for milk sold within the Commonwealth, wheresoever produced," including sales by milk dealers to other milk dealers, consumers, and stores and by stores to consumers. Subsection C is as follows: "It is hereby declared to be the legislative intent that the public emergency requires that the benefits of any increase of prices received by milk dealers by virtue of

the minimum price provisions of this section shall be given to producers, except in any case where the board deems a deviation from this policy necessary in order to maintain proper milk markets and outlets for producers. The board shall, whenever it deems such action necessary to accomplish this purpose, issue orders, rules or regulations to effectuate this intent." By subsection D it is provided that the board shall fix, by official order, the minimum prices to be paid by milk dealers to producers and others for milk.

Subsection B provides for the fixing of prices without specific requirement that any standard shall be followed or any facts found. The preceding subsection A does provide that the commission shall first ascertain what price will be most beneficial to the public interest and best protect the milk industry in the Commonwealth and take into consideration all conditions affecting the industry, including the amount necessary to yield a reasonable return to producer and dealer, but the price fixed is not required to be based on such matters. While the act is, in the language employed, far from being definite or satisfactory, in view of the fact that an act should be construed so as to be constitutional if possible to do so, we will assume that the matters referred to in subsection A are to be considered before fixing a price but are not required to form a basis for such price. We next note that there is no provision for making any findings of fact as a basis for a general order. The weakness of the act was apparently recognized by the legislature when the act was amended and extended by Act of April 30, 1935, for it was then provided that the commission should "after a hearing" ascertain the matters referred to and should "base all prices upon all conditions affecting the milk industry," including amounts necessary to yield a reasonable return to producer and dealer. In addition, by

the amended act the commission is required to file findings of fact with all orders fixing prices.

Now it will be observed that in respect of price fixing this act represents a marked contrast to the procedure in fixing rates to be charged by public utilities. In the case of the latter a tariff is filed by the utility and then the commission determines whether the rate is just, reasonable, etc., and that is done after hearing where the party affected has an opportunity to be heard, and the finding affects only the utility which is being investigated. Here the commission proceeds ex parte so far as a particular individual is concerned and fixes a price for a zone the extent of which is fixed by the commission, but applies alike to all those in the particular zone.

We are here concerned alone with the original act of 1934 and are intending to express no opinion on the act as amended. Referring to the original act and giving it a liberal construction, what if any standards are provided to govern the exercise of authority by the commission? It is to make an investigation and ascertain what prices will be most beneficial to the public interest and protect the milk industry, and it is to take into consideration all conditions affecting the milk industry including the amount necessary to yield a reasonable return. It is not required that those elements be made a basis or standard for a finding. Indeed, we fail to find any standard by which it is to be determined what will be beneficial to the public and the milk industry. This is a large question and one as to which different theories, social and economic, might be applied. Without any limitation the commission is then authorized to fix minimum and maximum prices. The commission may base its conclusion on any one of innumerable theories, that are now a matter of public discussion, as to the ideal relations which should exist between various groups of the whole state. All legisla-

tion is presumed to be enacted for the benefit of the state as a whole and to reasonably protect the interests of its members, but it has never heretofore been intimated that the legislature may vest in another body created by it the power to determine what rule or policy is for the interest of the state. We can see this price fixing section of the act as nothing more than legislation by commission, pure and simple.

We think that the distinction made here will become clear by considering concrete examples. The case of Hampton v. U. S., supra, is a conspicuous example of lawful delegation of power. The court was there concerned with the so-called "flexible tariff provision" of the Act of September 21, 1922 (19 USCA §§154-159) and the authority conferred upon the President. Congress there declared its policy to make the amount of tariff equalize, within prescribed limitations, the difference in cost of production in this and foreign countries. Realizing that such differential in prices would vary from time to time and place to place, Congress authorized the President, with the assistance of the tariff commission, to determine what those differentials were and base its action upon findings of fact as to the "differences in costs of production in the United States and the principal competing country." This standard was amplified by requiring the commission to take into consideration four matters. Then the proclaiming of a new tariff was made to depend on specific findings of fact which were intended to measure the difference in costs of production. As was pointed out by Chief Justice TAFT, the policy and standard were both declared by Congress and to the President was delegated only the power to find the specific facts as a requisite to a proclamation authorizing an increase of tariff. Now, let us assume that Congress had simply declared that in the regulation of foreign commerce certain inequities had appeared that were detrimental to the interests

of the country and then had authorized the tariff commission to fix whatever tariff they deemed to the best interest of the people as a whole and the businesses concerned. Would anyone contend that the commission would not be given legislative authority? Yet that is precisely what has been done in the act which we are considering. No standards are set up, except general welfare, and the board is not limited in the adoption of any theory, political, social, or economic, which in its judgment will accomplish a desired result. We can not imagine any clearer example of unconstitutional delegation of legislative authority.

It is argued that owing to varying conditions it is extremely difficult for the legislature in advance to fix prices which will be workable. That is not a sufficient excuse for the surrendering by the legislature of its prerogatives to a body of three men with power to regulate an entire industry and jeopardize, if not destroy, the property of our citizens.

We have a number of cases in Pennsylvania which indicate the line of demarcation. In Com. v. Falk (No. 1), 59 Pa. Superior Ct. 217, the legislature enumerated diseases of cattle and poultry which it deemed transmissible and then authorized a board created by the legislature to proclaim other diseases, now or hereafter, of a transmissible character and prohibited the shipping of cattle and stock having such diseases. There, there was a specific fact to be determined and action was made to depend upon that determination, to wit, what are transmissible diseases. In Com. v. Puder, 261 Pa. 129, 104 A. 505, the banking commission was given power to determine the character and general fitness of particular applicants for licenses to engage in the business of loaning money in sums of less than three hundred dollars. There again a specific fact was to be determined and action was made dependent on such determination. In O'Neil v. Amer. Fire Ins. Co., 166 Pa.

72, 30 A. 943, the state insurance commissioner was given authority to impose a uniform fire insurance policy upon all companies operating in this Commonwealth and this was held to be an unlawful delegation of power. We apply to the act we are considering the language of Chief Justice HUGHES in Panama Refining Co. v. Ryan, supra (p. 430), where it was said: "Instead of performing its lawmaking function, the Congress could at will......transfer that function to the President or other officer or to an administrative body. The question is not of the intrinsic importance of the particular statute before us, but of the constitutional processes of legislation which are an essential part of our system of government." What has been attempted to be done here is, as we see it, precisely what was condemned by the United States Supreme Court in the cases of Panama Refining Co. v. Ryan, supra, and Schechter Poultry Corp. v. U. S., supra.

Appellee contends that the milk act we are considering contains standards for the guidance of the Milk Control Board that are just as definite as in the case of the Public Service Company Act. With that statement we canot agree. In addition to the differences that we have heretofore pointed out, we call attention to the fact that in the case of utilities an individual rate made or proposed by the utility is investigated by the commission and the inquiry is as to whether that rate is unjust, unreasonable, or inadequate. Not only is the subject of investigation definite, but the meaning of the phrase "just, reasonable, and adequate" had by judicial decisions been given a definite meaning prior to the passage of our own act in 1913. In fact, even at common law where a shipper was charged an unreasonable rate he might recover the excess rate: Centre County Lime Co. v. P. S. C., 96 Pa. Superior Ct. 590; Texas & Pacific R. Co. v. Abilene O. C. Co., 204 U. S. 426, 27 S. Ct. 350, 353. In the past twenty years a

host of decisions have been rendered further defining the terms so that the expression "just, reasonable, and adequate" has a well defined meaning. In the milk act we are entering a new realm of price fixing without any definite or fixed plan or one that has been tried and tested. The business dealt with is one that is essentially private, at least as heretofore considered. Most important of all, the Milk Control Board Law nowhere says that the rate fixed by the board shall be just, reasonable, and adequate, or the equivalent of those words. The courts, federal and state, have many times said that one engaged in a purely private business may not be compelled to assume the responsibilities of a business affected with a public interest. The Milk Control Board is unfettered and uncontrolled as to the theory that it shall adopt in determining maximum and minimum prices.

The courts have frequently inferred that they did not regard "the public interest" as a sufficient standard if that phrase was of such broad content as to include anything relating to the general welfare. In New York Central Sec. Corp. v. U. S., 287 U. S. 12, 23, 53 S. Ct. 45, Chief Justice HUGHES was considering the force of the phrase as a standard and, citing Texas & Pacific Ry. Co. v. Gulf, etc., 270 U. S. 266, 277, 46 S. Ct. 263, said: "It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations......The provisions now before us were among the additions made by Transportation Act, 1920, and the term 'public interest' as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred." Also,

see U. S. v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1. The plenary discretion given to the Milk Control Board is vitally different. They have not had the advantage of long experience acquired by pragmatic tests but are empowered "to supervise and regulate the entire milk industry of this Commonwealth," as well as to fix rates.

There is another and graver objection to the validity of this delegation of power. It will be observed that the original act made no provision for the finding of facts on which it predicated action by the Milk Control Board. The record discloses that the first alleged violations by this defendant were to General Order No. 6 which was offered in evidence. We search that order in vain for any findings of fact or indication of the base upon which prices were fixed. It is a mere declaration of what the prices shall be for various grades of milk and localities. The same is true of General Orders 8, 9, 10, 12, and 13. Such orders are ineffective.

"If it could be said that from the four corners of the statute any possible inference could be drawn of particular circumstances or conditions which were to govern the exercise of the authority conferred, the President [Board] could not act validly without having regard to those circumstances and conditions. And findings by him [it] as to the existence of the required basis of his action would be necessary to sustain that action, for otherwise the case would still be one of an unfettered discretion as the qualification of authority would be ineffectual......But if from the extremely broad description contained in that section and the widely different matters to which the section refers, it were possible to derive a statement of prerequisites to the President's [Board's] action under section 9 (c) [18], it would still be necessary for the President [Board] to comply with those conditions and to show

that compliance as the ground of his prohibition. To hold that he [it] is free to select as he [it] chooses from the many and various objects generally described in the first section, and then to act without making any finding with respect to any object that he [it] does select, and the circumstances properly related to that object, would be in effect to make the conditions inoperative and to invest him with an uncontrolled legislative power": Panama Refining Co. v. Ryan, supra, pp. 431, 432.

It may be contended that this defect is waived by the stipulation filed by the parties. If the stipulation is broad enough to waive consideration of this question, it is one that cannot be passed over by us. Otherwise we would be considering a purely academic question. In addition the record itself discloses this defect.

The majority of this court are of the opinion that section 18 of the Milk Control Board Law is unconstitutional in that it violates the Bill of Rights of the Constitution of this Commonwealth and constitutes an unlawful delegation of authority by the legislature to the Milk Control Board to fix maximum and minimum prices. In view of the conclusions heretofore stated, we deem it unnecessary to refer to the other matters raised by the appellant.

We have had the benefit of arguments of unusual excellence by counsel for the parties concerned in this appeal and they have had the consideration that the importance of the matter demands, but we are not all of one mind. This matter is of such importance that, in the judgment of all the members of the court, it is expedient that the case should be decided by the Supreme Court of this Commonwealth, and the case will be certified to the Supreme Court for full consideration and decision when a dissenting opinion, or opinions, have been filed in accordance with the pro-

visions of section 10 of the Act of June 24, 1895, P. L. 212.

The order and decree of the court below are reversed.

KELLER, P. J., and BALDRIGE and RHODES, JJ. dissent.

DISSENTING OPINION BY KELLER, P. J.:

I feel obliged to record my dissent.

The Milk Control Act under review in this case is, admittedly, identical in essential respects with the New York Milk Control Act[1], which was passed upon by the Supreme Court of the United States in Nebbia v. New York, 291 U. S. 502. The decision in that case, therefore, settles, beyond question, that our Milk Control Act does not violate the 'Due Process' clause of the fourteenth amendment to the Federal Constitution. Dicta to the contrary in prior cases, which are cited in the opinion of the Court in this case, must be regarded as disavowed or overruled. The question before us is, Does it violate the corresponding 'Due Process' clause in our State Constitution, (Art. I, sec. 9)[2], or the first section of the Bill of Rights (Art. I), of our State Constitution, to-wit, "NATURAL RIGHTS OF MANKIND. All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness"? This declaration was copied verbatim from the Constitutions of 1838 (Art. IX, sec. 1) and 1790 (Art. IX, sec. 1) and is the practical equivalent of Clause 1, of the Declaration of Rights in the Con-

---

[1] Laws of 1933, (N. Y.) chap. 158.

[2] ".... nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land". See Constitution of 1776, Declaration of Rights, Cl. IX, Constitution of 1790, Art. IX, sec. 9, verbatim, Constitution of 1838, Art. IX, sec. 9, verbatim.

stitution of 1776[3]; so that it reaches back to the very beginnings of our existence as a Commonwealth.

In passing upon this question we must bear in mind that the constitutionality of a state statute is on a different footing from that of an Act of Congress. As our Federal Government, while possessing plenary authority within its allotted sphere or province, is one of delegated powers, the inquiry respecting a federal statute is, Has Congress, by express provision or necessary implication, been given authority to legislate on the subject under consideration and pass the act under review? But as respects a State statute, the inquiry is the converse—Has the State Legislature been forbidden, either by the Federal Constitution or by its own State Constitution, to legislate on the subject and pass the act under review? For by the Tenth Amendment to the Federal Constitution it is declared: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." And, as respects State legislation, in order to declare an Act of the General Assembly unconstitutional, its want of authority to pass the act must clearly appear,—to doubt is to decide in favor of its constitutionality: Com. v. Lukens, 312 Pa. 220, 223, 167 A. 167; Keator v. Lackawanna Co., 292 Pa. 269, 273, 141 A. 37; Kitty Roup's Case 81* Pa. 211.

We have already seen that the passage of the Act in question is not prohibited to the States by the Federal Constitution. A careful examination of Article III of our present State Constitution, which deals with 'Legislation' discloses no *express* prohibition of, or limitation on the power of the General Assembly to pass,

---

[3] "First. That all men are born equally free and independent, and have certain natural, inherent and inalienable rights, amongst which are, the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety."

the Act under consideration. The case therefore narrows down to the inquiry whether it is *impliedly* forbidden by the declarations (1) that the people have the inherent and indefeasible right of enjoying and defending life and liberty and of acquiring, possessing and protecting property, and (2) that no one can be deprived of his liberty or property unless by the law of the land. Does this general language forbid, as a deprivation of private property or an unwarrantable interference with it, the General Assembly, in the emergent conditions now existing, from passing a statute regulating the milk industry by requiring dealers to be licensed by a board created under its provisions, prohibiting those not so licensed from dealing in milk and milk products, and giving said board the right to fix the minimum prices to be paid the producer and the minimum and maximum prices to be charged the consumer, with the declared aim and purpose in view of acting for the protection of the health, welfare and comfort of the people of the State? I do not think that a reasonable interpretation of the general language of sections 1 and 9 of the Bill of Rights warrants the courts in holding that it amounts to a clear and explicit prohibition of the General Assembly from so legislating when such action is deemed necessary for the public welfare in a unique and basic industry such as the production, distribution and supply of milk.

Section 1 of our Bill of Rights was first promulgated in 1776 and the construction given to it by our lawmakers shortly after its adoption is of some help in its present interpretation. We find that on April 1, 1778 (Ch. 795, 9 Stat. at Large 236) an act was passed regulating the price of flax, flour, wheat, rye, corn, barley, oats, whiskey, cider, beer, pork, beef, butter, tallow, cheese, wool, hemp and bar iron. It is true that on May 25, 1778 (Ch. 799) the act was suspended until September 8, 1778, and on September 9, 1778 (Ch. 812)

it was repealed; but it shows that the fixing by the legislature of the prices of staple commodities, generally used by the inhabitants, was not deemed a violation of the Bill of Rights. So, too, on April 5, 1779 (Ch. 845, 9 Stat. at Large 387-390) an act was passed, *inter alia,* "For the regulation of the markets in the City of Philadelphia", which provided [section V] "That it shall and may be lawful to and for any three justices of the peace, in and for the City of Philadelphia, or any of the counties within this State, and they are hereby empowered and required, as often as there shall be occasion, to set, ascertain and appoint the assize and weight of all sorts of bread which shall be made for sale, sold or exposed to sale within the said city and liberties, or any county of the state, and the price to be paid for the same, as fully to all intents and purposes, as the mayor or recorder, and any two of the aldermen of the said city ought or could have done by the laws of the Province of Pennsylvania in force on the fourteenth day of May, one thousand seven hundred and seventy-six." [4] These statutes, and many others which might be dug up from the past,[5] were among those referred to by Chief Justice WAITE in Munn v. Illinois, 94 U. S. 113, 125, 132: "Under these powers [that is, the police powers] the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good. In their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, &c., and in so doing to fix a maximum of charge to be made for services rendered, accommo-

---

[4] Repealed Feb. 26, 1801, Chap. 2207.

[5] See "Business Regulation in Early Pennsylvania," Temple Law Quarterly, February 1936, (Vol. X, No. 2) pp. 155-178.

dations furnished, and articles sold. To this day, statutes are to be found in many of the States upon some or all these subjects; and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property......From this it is apparent that, *down to the adoption of the Fourteenth Amendment,* it was not supposed, that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due process of law......Under such circumstances, it is difficult to see why, if the common carrier, or the *miller,* or the ferryman, or the innkeeper, or the wharfinger, or the *baker,* or the cart man or the hackney-coachman, pursues a public employment and exercises 'a sort of public office', these plaintiffs in error [public warehousemen] do not......Certainly, if any business can be clothed 'with a public interest, and cease to be *juris privati* only,' this has been. It may not be made so by the operation of the constitution of Illinois or this statute, *but it is by the facts*" (italics supplied).

It seems clear to me that if statutes regulating, at one time or another, ferries, common carriers, hackmen, *bakers, millers,* wharfingers and innkeepers were not interferences with private property, contrary to the Bill of Rights, a statute regulating the modern milk industry is not violative of that constitutional provision; in view of the fact that it is a unique and basic industry absolutely necessary for the health and well being of the whole people and there is just ground for the enactment of the statute in the depressed condition of the productive end of the industry, with the reasonable expectation that if it continues it will result in widespread harm and injury to the general public. Certainly there is nothing fixed and static about the industries or busi-

nesses which may be regulated in the public interest, in the exercise of the police power of the State. As conditions change the right of regulation may be enlarged, so as to embrace other industries, or narrowed so as to take away the right of regulation previously exercised. Thus it has been extended so as to embrace public warehousemen (Munn v. Illinois, supra: Budd v. N. Y., 143 U. S. 517; Brass v. Stoeser, 153 U. S. 391); private carriers competing with common carriers (Stephenson v. Binford, 287 U. S. 251, 274); the business of fire insurance, (German Alliance Ins. Co. v. Kansas, 233 U. S. 389); stockyards, (Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 85); banks and banking (Noble State Bank v. Haskell, 219 U. S. 104). Mr. Justice HOLMES, in Block v. Hirsh, 256 U. S. 135, 155, said: "Circumstances may so change in time or so differ in space as to clothe with such an interest [that is, with a public interest] what at other times or in other places would be a matter of purely private concern". And in German Alliance Ins. Co. v. Kansas, supra, Mr. Justice McKENNA said: "They [the cases cited] demonstrate that a business, by circumstances and its nature, may rise from private to be of public concern, and be subject, in consequence, to governmental regulation" (p. 411). Mr. Justice SUTHERLAND in Village of Euclid v. Ambler Realty Co., 272 U. S. 365, said (p. 386-7): "Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect to use and occupation of private lands in urban communities. Regulation, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained,

a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise."

The same thing can be said of some of our modern industries, particularly, the milk industry. In the early days of our existence as a State, even in town and urban communities, it was not uncommon for householders to keep their own cow, and the distribution and supply of milk was a comparatively simple matter, largely local in scope and operation. Today it is expanded so as to be statewide and even interstate in character. Exacting regulations looking to the public health have already been enacted, which greatly increase the cost of production. Practically no milk is produced for private consumption in town and city, and dairy farming has become a widespread industry, subject already to much regulation and inspection, on which the health and well-being of the people is largely dependent. The milk industry is not only absolutely vital to the health and well-being of the whole people, and especially growing children, but it is also unique and in a class by itself because (1) milk cannot be kept by the producer, but must be delivered to the dealer within twenty-four hours of production; (2) the supply must exceed the demand by a reasonable margin in order to provide for emergencies, and this excess over the normal de-

mand be put to less profitable uses and consequently paid for at a smaller price; (3) the method of payment is based on how it is utilized by the dealer, who reports to the producer the uses made of it; (4) it must be handled with the utmost care from start to finish and is hedged about by a host of sanitary regulations, for the protection of the public, because it is a most fertile field for the growth of bacteria. These facts make the dairy farmer or producer dependent for his return on the use to which the dealer to whom he delivers it puts it. His commodity and the price he receives for it are so far out of his control that, as a matter of fact his supposed freedom of contract is largely illusory and at the mercy of the dealer unless the legislature intervenes for his protection; not primarily for his benefit, but only secondarily or incidental to the main purpose of promoting the public welfare by seeing to it that an adequate supply of pure milk is available at a price reasonable to the public, the dealer and the producer. The collection, transportation, distribution, and supply of dairy products has gravitated into the hands of a comparatively few dealers, as compared with former conditions. One of the results of the process has been to lower the return to the producer so that in many cases it is less than the cost of production, and commonly does not afford him reasonable compensation for his labor nor a fair return on his invested capital. A prolonged continuance of this condition would necessarily result in cutting down the herds of dairy cows, with a consequent shortage of product and corresponding high or exorbitant prices in a commodity absolutely essential for the health and well-being of our people, especially young children. To say that the 'Due Process' clause in our Bill of Rights, or the declaration that all men have certain inherent and indefeasible rights among them those of acquiring, possessing and protecting property, prevents the State from dealing

with a situation of this nature, with consequences so fraught with harm and danger to the general public, is carrying its meaning far beyond what anyone contemplated when it was first promulgated, or even when last adopted as part of our present Constitution. Since then we have regulated and licensed so many businesses and professions that it is difficult for the average lawyer—let alone a layman—to keep up with them, and none of them surpasses,—if it equals—in importance to public health and well-being, the business of producing and supplying milk and dairy products to the public. Accountants, architects, beauty culturists, dentists, engineers, midwives, nurses, pharmacists, physicians and surgeons, plumbers, real estate brokers, undertakers, veterinarians, are all required to be licensed, or registered, after examination, before they can lawfully practice their professions, or pursue their business, respectively, and their liberty of contract, as respects the employment of their services, is correspondingly limited and circumscribed.

The point in mind cannot be better expressed than in the opinion of Mr. Justice ROBERTS in the Nebbia case, from which I quote as follows—(omitting the notes, which refer to the cases supporting the text): "Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest ...... These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to

regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need. The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit government regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts ...... The court has repeatedly sustained curtailment of enjoyment of private property, in the public interest. The owner's rights may be subordinated to the needs of other private owners whose pursuits are vital to the paramount interests of the community. The state may control the use of property in various ways; may prohibit advertising bill boards except of a prescribed size and location, or their use for certain kinds of advertising; may in certain circumstances authorize encroachments by party walls in cities; may fix the height of buildings, the character of materials, and methods of construction, the adjoining area which must be left open, and may exclude from residential sections offensive trades, industries and structures likely injuriously to affect the public health or safety; or may estab-

lish zones within which certain types of buildings or businesses are permitted and others excluded. And although the Fourteenth Amendment extends protection to aliens as well as citizens, a state may for adequate reasons of policy exclude aliens altogether from the use and occupancy of land. Laws passed for the suppression of immorality, in the interest of health, to secure fair trade practices, and to safeguard the interests of depositors in banks, have been found consistent with. due process. These measures not only affected the use of private property, but also interfered with the right of private contract. Other instances are numerous where valid regulation has restricted the right of contract, while less directly affecting property rights. The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. Regulation of a business to prevent waste of the state's resources may be justified. And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency. Legislation concerning sales of goods, and incidentally affecting prices, has repeatedly been held valid. In this class fall laws forbidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers, and by other forms of price discrimination. The public policy with respect to free competition has engendered state and federal statutes prohibiting monopolies, which have been upheld. On the other hand, where the policy of the state dictated that a monopoly should be granted, statutes having that effect have been held inoffensive to the constitutional guarantees. Moreover, the state or a municipality may itself enter into business in competition with private proprietors, and thus effectively although

indirectly control the prices charged by them ......
The touchstone of public interest in any business, its
practices and charges, clearly is not the enjoyment of
any franchise from the state, Munn v. Illinois, supra.
Nor is it the enjoyment of a monopoly; for in Brass v.
North Dakota, 153 U. S. 391, a similar control of prices
of grain elevators was upheld in spite of overwhelming
and uncontradicted proof that about six hundred grain
elevators existed along the line of the Great Northern
Railroad, in North Dakota; that at the very station
where the defendant's elevator was located two others
operated; and that the business was keenly competi-
tive throughout the state. In German Alliance In-
surance Co. v. Lewis, 233 U. S. 389, a statute fixing the
amount of premiums for fire insurance was held not to
deny due process. Though the business of the insurers
depended on no franchise or grant from the state, and
there was no threat of monopoly, two factors rendered
the regulation reasonable. These were the almost
universal need of insurance protection and the fact
that while the insurers competed for the business, they
all fixed their premiums for similar risks according to
an agreed schedule of rates. The court was at pains
to point out that it was impossible to lay down any
sweeping and general classification of businesses as to
which price-regulation could be adjudged arbitrary or
the reverse. Many other decisions show that the private
character of a business does not necessarily remove it
from the realm of regulation of charges or prices. The
usury laws fix the price which may be exacted for the
use of money, although no business more essentially
private in character can be imagined than that of loan-
ing one's personal funds. Griffith v. Connecticut,
218 U. S. 563. Insurance agents' compensation
may be regulated, though their contracts are pri-
vate, because the business of insurance is consid-
ered one properly subject to public control. O'Gor-
man & Young v. Hartford Fire Ins. Co., 282 U. S.

251. Statutes prescribing in the public interest the amounts to be charged by attorneys for prosecuting certain claims, a matter ordinarily one of personal and private nature, are not a deprivation of due process. Frisbie v. United States, 157 U. S. 160; Capital Trust Co. v. Calhoun, 250 U. S. 208; Calhoun v. Massie, 253 U. S. 170; Newman v. Moyers, 253 U. S. 182; Yeiser v. Dysart, 267 U. S. 540; Margolin v. United States, 269 U. S. 93. A stockyards corporation, 'while not a common carrier, nor engaged in any distinctively public employment, is doing a work in which the public has an interest,' and its charges may be controlled. Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 85. Private contract carriers, who do not operate under a franchise, and have no monopoly of the carriage of goods or passengers, may, since they use the highways to compete with railroads, be compelled to charge rates not lower than those of public carriers for corresponding services, if the state, in pursuance of a public policy to protect the latter, so determines. Stephenson v. Binford, 287 U. S. 251, 274. It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. Wolff Packing Co. v. Industrial Court, 262 U. S. 522, 535. The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions 'affected with a public interest,' and 'clothed with a public use,' have been brought forward as the criteria of the validity of price control, it has been admitted that they are not susceptible of defini-

tion and form an unsatisfactory test of the constitutionality of legislation directed at business practices or prices. These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells ...... The law-making bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discrim-

inatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

· In the early part of his opinion (pp. 515 to 522) Mr. Justice ROBERTS set forth in detail the circumstances which led the Legislature of New York, after a full investigation by a joint committee, appointed to examine into the subject, the results of which were embodied in a full and comprehensive report, to enact the legislation under review in the Nebbia case, and they establish beyond question the necessity for some action looking to the relief of the dairy industry, if widespread calamity to the general public was to be avoided, and demonstrate that the means chosen to remedy the mischief was not unreasonable, arbitrary or capricious but had a real and substantial relation to the object sought to be attained. That like or similar conditions prevailed in this State cannot successfully be gainsaid. The subject was sufficiently important and threatening to cause the appointment of a joint legislative committee— See Joint Resolution continuing its appointment, Pamphlet Laws 1933, p. 1034—and the preamble to the statute under consideration (Act of January 2, 1934, P. L. 174—Special Session 1933-34) specifically recognizes the existence in this State of conditions present in New York. It is wholly immaterial that the Joint Legislative Committee of this State may not have presented its completed report. Conditions are so similar in the two States—they adjoin, and both have metropolitan districts, and many urban communities as well as rural districts—that our General Assembly may have accepted the results of the 473-page report of the Joint Legislative Committee of New York and · acted upon it. It would not be an unwarrantable action to do so.

Nor does the fact that the statute, while enacted primarily for the benefit of the general public, may

also produce special benefit or advantage to the dairy farmers or milk producers of the Commonwealth, operate to render the Act unconstitutional. It was held in Peterson Baking Co. v. Bryan, 290 U. S. 570, 575, (opinion by Mr. Justice BUTLER) that where a statute regulating the weight of loaves of bread has the double purpose of protecting customers from short weight and of protecting the bakers from unfair competition, it will not be held unconstitutional as to bakers unless shown to be so in both respects. So, in this case, in the opinion of the legislature, no permanent removal of the conditions which threaten the general public can be secured until a more equitable division is made of the money paid by the consumer, and a larger and more stable proportion is secured to the farmer and producer. If this is correct,—and there is no valid basis for the courts to refuse to accept it,—the interests of the general public are, to some degree, bound up with those of the producer and the fact that the general good flowing to the public will carry along with it a particular good to the milk producer, does not render the statute unconstitutional.

It may be that the results to be obtained will not measure up to those anticipated by the law making branch, but that is not the lookout of courts. Its effects, certainly, cannot be measured until it is given a fair trial. If it proves not to be efficacious, the law making body will, no doubt, repeal it. The wisdom of legislation, if constitutional, is not a matter for inquiry by the courts.

The cases chiefly relied upon in the majority opinion for holding the Milk Control Act to be in conflict with our constitutional guaranties against depriving the people of liberty or property unless by the law of the land, and protecting them in their enjoyment of liberty and in their right to acquire, possess and protect property fall into two classes: (1) Decisions of the Su-

preme Court of the United States dealing with the Fourteenth Amendment to the Federal Constitution and (2) cases of our own appellate courts. As to the former in so far as they express dicta referable to the milk industry they are definitely departed from and overruled by the Nebbia case, and the later cases of the United States Supreme Court which reaffirm that decision[6]. The Pennsylvania cases are Godcharles v. Wigeman, 113 Pa. 431, 6 A. 354, and Com. v. Brown, 8 Pa. Superior Court 339. The Act reviewed in the former sought to compel corporations engaged in mining and manufacturing to pay their employees in cash or in orders payable in cash instead of by orders on. Company stores, which was the mischief intended to be remedied. Following the above decision of our Supreme Court, in 1886, that the remedy for the mischief in question—which, by the way, was a very real one and is now generally so recognized—could not be applied in that form, the legislature in 1891 passed an Act (June 9, 1891, P. L. 256) which has not been declared unconstitutional, forbidding mining and manufacturing companies to operate company stores selling products other than their own manufacture. In Com. v. Brown, 8 Pa. Superior Ct. 339 the act under consideration was one which required bituminous coal to be weighed before it was screened so that the miner might be paid for all that he had mined. It requires little reflection to see that both of these statutes which were held to be in conflict with our Bill of Rights affected nobody but the employees (1) of mining and manufacturing companies and (2) of bituminous coal companies. They had no relation to the general public or the health and well-being of the people of the whole State. Beneficial as those statutes may have been in purpose

---

[6] The latest is Borden's Farm Products Co. v. Ten Eyck, 297 U. S. 251,

the public at large were not affected by them. They were enacted with the purpose of benefiting the employees of certain classes of corporations and no one else. The people at large were not affected by them. The distinction between those Acts and the one now under consideration is apparent. On the other hand in Mahon v. Penna. Coal Co., 274 Pa. 489 (1922), 118 A. 491, the Supreme Court of Pennsylvania, having regard to the public welfare of a large and important section of the Commonwealth upheld as constitutional and not in conflict with the same sections of our Bill of Rights as are now under consideration an Act of Assembly which in effect nullified and set aside contracts relieving anthracite coal operators of supporting the surface above their mines. The court said: "The anthracite coal field of Pennsylvania comprises a large area, on the surface of which have grown up, and now exist, many cities, boroughs and villages, containing a population of approximately a million persons. When this district was sparsely peopled, the caving-in of the surface was not of public moment; but, within the past fifteen or twenty years, it has become a matter of widespread notoriety that these disturbances menace the safety and material welfare of the inhabitants of communities in that part of the State. During the period mentioned, the facts have been put before the public, not only by news of the collapse of streets and the fall of buildings, but also through the reports of commissions created by joint resolutions of the legislature and by means of numerous proposed statutes, antedating the present law, introduced into that body, some of which passed and others did not; likewise, by messages from the governor of the Commonwealth addressed to the general assembly. The conditions that gave rise to the act are summarized in a preamble thus: 'Whereas the anthracite coal industry in this Commonwealth has been and is being

carried on in populous communities in such a manner as to remove the entire support of the surface of the soil to such an extent as to result in wrecked and dangerous streets and highways, collapsed public buildings, churches, schools, factories, streets, and private dwellings, broken gas, water and sewer systems, the loss of human life, and in general so as to threaten and seriously endanger the lives and safety of large numbers of the people of the Commonwealth; therefore be it enacted,' etc. ...... That the conditions portrayed in the legislative declaration are such as to create an emergency, properly warranting the exercise of the police power, is sufficiently obvious not to call for extended discussion. It is primarily for the legislature to consider and decide on the fact of a danger, then meet it by a proper remedy: Stafford v. Wallace, 42 U. S. Supreme Ct. Rep. (issue of June 9, 1922), 397, 401. Of course, the cure must always bear a substantial relation to the existing evil, and must not constitute a mere attack on property rights, disguised as an exercise of the police power. In judging of this, however, it is to be remembered that 'in order to serve the public welfare, the State, under its police power, may lawfully impose such restrictions upon private rights as, in the wisdom of the legislature, may be deemed expedient; for all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community ...... and a statute enacted for the protection of public health, safety or morals can be set aside by the courts only when it plainly has no real or substantial relation to these subjects or is a palpable invasion of rights secured by the fundamental law; if it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination is conclusive': ......"

That language can, in principle, fitly be applied here. It is true that the Supreme Court of the United States reversed that decision of the Supreme Court of this State, and held that the statute violated the Federal Constitution[7], but that decision does not affect the fact that as respects the provisions of our own State Constitution now being considered it was held not to be unconstitutional. This is very pertinent here, for as before pointed out practically the same statute as that now under review has been held by the Supreme Court of the United States in the Nebbia case not to be in conflict with the Federal Constitution.

As to the objection that the statute delegates legislative power to the Milk Control Board, that gives me little concern or anxiety. Courts which have accepted as constitutional the Public Service Company Law and the Anthracite & Bituminous Mine Codes, and the Acts giving authority to the Department of Labor & Industry and the Department of Health to adopt rules and regulations, etc., etc., (See Gima v. Hudson Coal Co., 106 Pa. Superior Ct. 288, 299, 161 A. 903), should not strain at the powers given the legislature's agent, the Milk Control Board, under this Act. A moment's consideration must convince an open mind of the impracticability of the General Assembly itself conducting the hearings and arriving at the conclusions necessary for fixing fair rates for producer, distributor, dealer and consumer in widely scattered and wholly dissimilar sections of the State. It has set forth in plain and unmistakable language the basic purposes and primary standards which it has in mind in an attempt to remedy the mischievous conditions which are present in the milk industry, a continuance of which threatens the welfare and well-being of the whole people; and having done so it may lawfully appoint the Board its agent upon whom devolves the duty to

---

[7] Penna. Coal Co. v. Mahon, 260 U. S. 393.

carry out the legislative policy. It has not delegated its power to make law, but has delegated the power to determine facts and apply the intention of the legislature to conditions thus determined. To make use of an agency adapted to put into effect the details which it would be impracticable for the legislature to look after is not making the agent a legislative body, nor acting in violation of the constitutional provision: "The legislative power of this Commonwealth shall be vested in a General Assembly which shall consist of a Senate and House of Representatives" (Art. II, sec. 1).

I can see no real distinction in this respect between the Public Service Company Law (Act of July 26, 1913, P. L. 1374) and the Milk Control Act now under review. It was wholly impracticable for the General Assembly itself to regulate public service corporations in the interest of the public welfare and fix schedules of rates applicable to all sorts of utilities in widely divergent communities, which were fair, just and reasonable to both the public and the utility. It was necessary to appoint a Board to act as its agent in the securing of the information necessary to be obtained before specific rules and regulations could be promulgated and rates which were just, fair and reasonable to both the public and the utility could be determined. It laid down the basic principles and primary standards which were to govern the price regulating activities of its agent—the public service company was entitled, if able to earn it, to a reasonable return on the present value of its property used and useful in the public service, and no more; and the public was entitled to be protected against being required to pay more than was fair, just and reasonable in the circumstances. The Milk Control Act requires the Board to ascertain by examination and investigation what prices for milk in the several localities and markets of the Commonwealth, and under varying conditions, will be most

beneficial to the public interest and will best protect the milk industry in the Commonwealth and insure a sufficient quantity of pure and wholesome milk to adults and minors, having special regard to the health and welfare of children in the Commonwealth. They shall take into consideration all conditions affecting the industry, including the amount necessary to yield a reasonable return to the producer and to the milk dealer; and after by such examination and investigation they shall have arrived at the information necessary to enable them to perform the duties imposed on them in accordance with the primary standards thus announced by the legislature, they are required to fix the minimum wholesale and retail prices and may fix the maximum wholesale and retail prices to be charged for milk sold in the various districts of the Commonwealth; it being the declared legislative intent that the public emergency requires that the benefits of any *increase* of prices received by milk dealers by virtue of the minimum price provision aforesaid shall be given to producers, except where the board deems a deviation from this policy necessary in the public interest in order to maintain proper milk markets and outlets for producers. That public service companies are required to file schedules of rates does not make a real or vital distinction, for the Public Service Commission finally determines whether the rates thus filed are just, fair and reasonable. And the Commission is not obliged to have a complaint from some consumers before it can act. It may initiate the proceeding itself, and make it applicable to an entire industry. The filing of proposed rates by the public utility corporation is only a procedural matter intended to insure equality of treatment and guard against discrimination. It applies to many kinds of public service companies. This Act applies to only one, and the duty is imposed on the board to find out and fix prices which are just, fair and reasonable to producer,

dealer and the public. No advantage would be obtained by filing rates or prices before the Board had ascertained what were fair, just and reasonable; and it would be fruitless and of no benefit to do so after the Board had acted. The rights of producers and dealers are expressly guarded against confiscation by an appeal to the courts in this Act just as they are in the Public Service Company Law. With all due respect to the majority opinion, I see no real, vital or substantial difference between the two Acts as respects delegation of legislative powers.

The opinion refers at some length to the apparent failure of the Board to make complete and definite findings of fact. This question was not raised by the appellant. On the contrary it was stipulated that the record should contain only the proceedings from the time when appellant took an appeal from the order of the Board revoking his license as of December 4, 1934. Consequently the hearings of the Board held pursuant to the directions of the statute in the ascertainment of facts necessary to fix prices, etc. and the findings made by them in connection therewith are not before us. The appellant expressly admitted "that all questions relative to the procedure of the Milk Control Board prior to the date of the revocation of appellant's milk dealers license were regular, *the facts found by the Milk Control Board were correct* and that the only question before the Superior Court in the instant appeal is the question of the constitutionality of the Milk Control Law of the Commonwealth of Pennsylvania passed at the 1933-1934 Special Session of the Legislature of Pennsylvania, known as Act No. 37 approved January 2, 1934, P. L. 174 and entitled an Act relating to milk and to products thereof; declaring an emergency with respect to their production and market; creating a Milk Control Board, etc."

The appellant could have appeared and been heard at the hearings of the Board, and could have appealed

to the courts from their findings and order fixing prices, but he did not. Having failed to do so at the proper time he is precluded from raising those questions now: Hegeman Farms Corp. v. Baldwin, 293 U. S. 163.

There is no merit at all in the suggestion that the act under review violates section 3 of Article III of our Constitution because the title contains no reference to the right of the Board to revoke for cause a license issued by it. The Public Service Company Law says nothing in its title about the right of the Public Service Commission to revoke a certificate of public convenience authorizing a common carrier to act as such. Yet the right of such revocation was upheld in Day v. P. S. C., 107 Pa. Superior Ct. 461, 164 A. 65, affirmed 312 Pa. 381, 167 A. 565. The Act of May 13, 1887, P. L. 108, regulating the sale of intoxicating liquors,—commonly known as the Brooks High License Law—said nothing in its title about revoking liquor licenses, yet the right to do so was recognized. The same right of revocation for cause, unless expressly withheld, applies to all our statutes regulating intoxicating liquors since. The title need not be an index to the contents. Whatever is reasonably germane to the subject matter in the title may be included in the statute.

The other points raised on appeal, but not discussed in the majority opinion, do not merit serious consideration.

I would affirm the judgment of the lower court and hold the act constitutional.

Judge BALDRIGE and Judge RHODES join in this dissent.