## Milk Control Commission v. Valleywood Milk Co. et al.

*B. Henry Bruner,* and *Thomas McK. Chidsey,* Attorney General, for Commonwealth.

*Daniels & Harter,* for defendant.

*E. Kirk Brown* and *B. M. Zimmerman,* amici curiæ.

RUPP, P. J., April 30, 1948.—This is an action by the Milk Control Commission to recover, on behalf of certain Pennsylvania and Maryland milk producers, $55,819.30 on a milk dealer's bond filed with the commission by defendant Valleywood Milk Company (a

Pennsylvania corporation), as principal, and defendant Seaboard Surety Company (a New York corporation duly authorized to engage in business in Pennsylvania) as surety.

The bond, in the sum of $78,000, was given pursuant to section 501, as amended, of the Milk Control Law of April 28, 1937, P. L. 417, as amended, 31 PS §700j-101, et seq., prior to the issuance by the commission to principal defendant of a milk dealer's license for the license year May 1, 1947, to April 30, 1948, inclusive.

The condition of the bond was that the principal "pay all amounts due with interest thereon, including all amounts due under the Milk Control Law and its amendments and the orders of the Milk Control Commission, or any other applicable official prices, or any lawful contract price, for milk purchased or otherwise acquired from producers by the principal during said license year, or upon such terms and conditions as the Milk Control Commission may prescribe."

In its complaint the commission averred that during the period from May 1, 1947, to June 30, 1947, inclusive, the Valleywood Milk Company purchased and received milk from milk producers, in accordance with the Milk Control Law and official general orders of the commission, but failed to pay specified Pennsylvania producers specified amounts aggregating $35,-988.49 (subsequently stipulated to be $34,629.74) and specified Maryland producers specified amounts totaling $19,830.81 (subsequently stipulated to be $21,-189.56); that although requested to do so, both defendants have refused, and still refuse, to pay the aforesaid sums, hence its action on the bond.

Defendant Valleywood Milk Company, which is in receivership, did not file an answer.

Defendant surety company answered the complaint, admitting Valleywood's failure, and the surety's re-

fusal to pay, but denying any liability on the surety's part, alleging that:

As to the Maryland producers, the milk produced by and purchased from them was not subject to the jurisdiction of the Milk Control Law, the Milk Control Commission or the commission's general orders; and that the surety bound itself (in case of Valleywood's failure to do so) to pay only for milk purchased by Valleywood which was produced by Pennsylvania producers and sold at prices in accordance with the Milk Control Law.

Under new matter, the surety alleged that if the Milk Control Law should be construed to extend the jurisdiction of the commission to milk produced without the Commonwealth which is purchased by Pennsylvania dealers, it would be violative of the Federal and State Constitutions; and that even if the commission had jurisdiction so to do, it never issued any general orders fixing prices to be paid by Pennsylvania dealers for milk produced without the State.

As to both Pennsylvania and Maryland producers—under new matter defendant surety alleged that the implied condition of the bond was that the commission would enforce compliance by Valleywood with all the provisions of the Milk Control Law, and that since the commission failed to require Valleywood to maintain within the Commonwealth for the commission's audit and inspection the records specified by section 701 of the Milk Control Law (as to amounts of milk purchased, utilization of milk purchased, and payments made for such milk), the liability of the surety company was rendered greater than was contemplated, and therefore the bond was breached.

In its reply denying the allegations of the new matter, supra, the commission averred, inter alia, that, upon demand, Valleywood delivered the records required by section 701 into the possession of the com-

mission's agents for their inspection and audit. Also, that under the bond the surety obligated itself to "any lawful contract price" for milk purchased.

At the hearing before this court, counsel stipulated of record that although the commission did not require Valleywood to keep the aforesaid records within the Commonwealth, principal defendant maintained them at its principal offices in Washington, D. C., and that when the agent of the commission went to Washington and asked to see the records they were made available.

A brief was filed on behalf of 28 Maryland producers as amicus curiæ.

### The Statute

Section 501, as amended, of the Milk Control Law, supra, reads, in part, as follows (31 PS §700j-501):

"It shall be unlawful for a milk dealer or handler to purchase, acquire or receive on consignment or otherwise milk from producers unless the milk dealer or handler shall file with the commission a corporate surety, individual surety, or collateral bond, approved by the commission. Except as otherwise herein provided, the bond shall be in a sum equal to the value of the highest aggregate amount of milk purchased, acquired or received by the dealer or handler from producers in any one month during the preceding calendar year, which value shall be computed according to lawful prices, and shall not in any event exceed one hundred thousand dollars ($100,000.00). The bond shall be upon a form prescribed by the commission, conditioned for the payment by the milk dealer or handler of all amounts due, including amounts due under this act and the orders of the commission, for milk purchased or otherwise acquired from producers by the milk dealer or handler during the license year, upon such terms and conditions as the commission may prescribe."

*Discussion*

We see no merit in the surety's contention as to the breaching of the bond. As indicated, the records required by section 701 were maintained and made available upon demand. Surely, the fact that Valleywood kept the records in Washington, D. C., rather than in Pennsylvania did not so increase the surety's risk beyond the intent of the bond as to terminate its liability thereunder. Nor, as alleged, is the commission's failure to disclose to the surety Valleywood's noncompliance with the strict letter of the statute in this regard a defense to the surety sufficient to avoid its liability on the bond. None of the cases cited by the surety in support of this contention is applicable. Moreover, we understand this point is not being pressed.

The bond being valid and there being no other contention as to Pennsylvania producers, we accordingly conclude, without further discussion, that judgment in the amount due them must be entered against the surety and in favor of the commission.

Is the surety liable under the bond for the amounts due Maryland producers?

In order to answer this question we must determine (1) Whether out-of-State producers come within the purview of the Milk Control Law, and (2) if so, is the act to that extent unconstitutional as placing an undue burden upon interstate commerce in violation of the commerce clause of the Federal Constitution?

We are satisfied that if the Milk Control Law were to be construed as applying to out-of-State producers, to that extent it would unconstitutionally regulate and burden interstate commerce. However, we shall not elaborate this point, since we have concluded that it was not the intent of the legislature that the act embrace out-of-State producers.

In reaching this conclusion we have been guided by the presumption that the legislature does not intend

to violate the Constitution of the United States or of this Commonwealth (section 52(3) of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §552) and by the well-established principle that where two constructions can be placed upon a statute, one of which will render it constitutional and the other unconstitutional, the former construction must be invoked: Monroe Loan Society of Pennsylvania v. Morello, 160 Pa. Superior Ct. 418 (1947); Fidelity-Philadelphia Trust Co. et al. v. Hines, 337 Pa. 48 (1940); Dauphin County Grand Jury Investigation Proceedings (No. 3), 332 Pa. 358 (1938).

Likewise, in ascertaining the legislative intent we have considered, among other matters, the circumstances which led to the enactment of the statute, the object to be attained, and especially the evil which it was designed to correct (section 51 of the Statutory Construction Act, supra, 46 PS §551; Provident Life & Trust Co. v. Klemmer, et al., 257 Pa. 91 (1917); Verona v. Schenley Farms Co., 312 Pa. 57 (1933)), the preamble of the statute (section 54 of the Statutory Construction Act, supra, 46 PS §554), and the presumption that the legislature does not intend a result that is absurd, impossible of execution or unreasonable: section 52(1) of the Statutory Construction Act, supra, 46 PS §552.

The statute, in its preamble, declares that "The production, sale and distribution of milk and certain milk products *in this Commonwealth* [the third greatest milk producing and consuming state of the nation] are attendant with serious conditions affecting milk producers, milk dealers and consumers of milk . . . and . . .

"*Whereas*, It is necessary to preserve and promote the strength and vigor *of the inhabitants of this Commonwealth*, to protect the public health and welfare, and to prevent fraud and imposition upon consumers and producers by continuing to treat the production,

transportation ... distribution, and sale of milk *in the Commonwealth of Pennsylvania* as a business affecting the public health and affected with a public interest." (Italics supplied.)

Section 101 makes clear the legislative purpose that "In the exercise of the police power of the Commonwealth, it is hereby declared that the production, transportation . . . distribution and sale of milk *in the Commonwealth* is a business affecting the public health and affected with a public interest, and it is hereby declared that this act shall be and is hereby enacted for the purpose *of regulating and controlling the milk industry in this Commonwealth,* for the protection of the public health and welfare and for the prevention of fraud." (Italics supplied.) (To the same effect see the preambles and sections on legislative intent in the Milk Control Board Law of January 2, 1934, P. L. 174, Special Session of 1933-34, and the Milk Control Board Law of April 30, 1935, P. L. 96).

Section 301, as amended, declares that the commission is the instrumentality of the Commonwealth for the purpose of administering the provisions of the act and to execute the legislative intent therein expressed and is vested with power to *"supervise, investigate and regulate the entire milk industry of this Commonwealth,* including the *production* . . . and sale of milk and milk products *in this Commonwealth.* . . ." (Italics supplied.)

Section 801, as amended, gives the commission power, after a hearing in which all interested persons must be given reasonable opportunity to be heard, *to set up milk marketing areas within the Commonwealth,* describe their territorial extent, designate them by name and number, and states that the commission *"shall ascertain and maintain such prices for milk in the respective milk marketing areas* as will be most beneficial to the public interest, *best protect the milk industry of the Commonwealth* and insure a

sufficient quantity of pure and wholesome milk *to inhabitants of the Commonwealth, . . ."* (Italics supplied.)

The section also states that "The commission shall base all prices upon all conditions affecting the milk industry *in each milk marketing area,* including the amount necessary *to yield a reasonable return to the producer. . . .* In ascertaining such returns, the commission shall utilize a cross-section representative of the average or normally efficient *producers* and dealers or handlers *in the area."* (Italics supplied.)

Section 808, as amended, provides that "It is hereby declared to be the legislative intent that the instant (whenever that may be) that the handling by a milk dealer or handler of milk produced outside of the Commonwealth *becomes a subject of regulation by the Commonwealth in the exercise of its police powers,* the restrictions set forth in this act respecting such milk so produced shall apply, and the powers conferred on the commission by this act, and particularly by this article, shall attach; . . ." (Italics supplied.)

Section 1202 (erroneously numbered 1201) states that "No provision of this act shall apply, or be construed to apply, to foreign or interstate commerce, except in so far as the same may be effective in accordance with the Constitution of the United States and the laws of the United States enacted pursuant thereto."

Thus, throughout the act itself, the legislature set forth in clear and unmistakable language that, in the exercise of the police power of the State, the Milk Control Law was enacted to control and regulate the milk industry in this Commonwealth, for the protection of the public health and welfare and for the prevention of fraud; and to stimulate the production and distribution of milk in this Commonwealth in order to insure to its inhabitants an adequate supply of pure, wholesome milk. It is equally clear that, in order to effectuate

the aforesaid purposes of the act, the legislature inserted the provisions empowering the commission to determine, in each of the Commonwealth's milk marketing areas, minimum prices to be paid producers by dealers, sufficient to insure them a reasonable return, and requiring dealers to file bonds to secure payment to producers.

That these were the objectives of the legislature repeatedly has been pointed out by our appellate courts.

In Rohrer v. Milk Control Board, 322 Pa. 257 (1936), a majority of the Supreme Court adopted as the opinion of that court the dissenting opinion of President Judge Keller of the Superior Court, reported in 121 Pa. Superior Ct. 281 (1936).

In passing upon the constitutionality of the original Milk Control Act of 1934, supra, Judge Keller said (322 Pa. 257, 272):

"Nor does the fact that the statute, while enacted primarily for the benefit of the general public, may also produce special benefit or advantage to the dairy farmers or milk producers of the Commonwealth, operate to render the act unconstitutional. . . ."

And again at page 278:

". . . The Milk Control Act requires the board *to ascertain by examination and investigation what prices for milk in the several localities and markets of the Commonwealth,* and under varying conditions, *will be most beneficial to the public interest and will best protect the milk industry in the Commonwealth and insure a sufficient quantity of pure and wholesome milk* to adults and minors, having special regard to the health and welfare of children *in the Commonwealth.* They shall take into consideration all conditions affecting the industry, *including the amount necessary to yield a reasonable return to the producer* and to the milk dealer; *and after* by such examination and investigation *they shall have arrived at the infor-*

*mation necessary to enable them to perform the duties imposed on them in accordance with the primary standards thus announced by the legislature, they are required to fix the minimum wholesale and retail prices* and may fix the maximum wholesale and retail prices *to be charged for milk sold in the various districts of the Commonwealth; it being the declared legislative intent that the public emergency requires that the benefits of any increase of prices received by milk dealers by virtue of the minimum price provision aforesaid shall be given to producers,* except where the board deems a deviation from this policy necessary in the public interest in order to maintain proper milk markets and outlets for producers. . . ." (Italics supplied.)

Subsequently, in Colteryahn Sanitary Dairy v. Milk Control Commission, 332 Pa. 15 (1935), in referring to the present Milk Control Law, the Supreme Court said (p. 20):

"*We held that the former Milk Control Law* (Act of January 2, 1934, P. L. 174), *regulating the milk industry by requiring dealers to be licensed and to give bonds with the power in the Board to fix minimum and maximum prices,* was a valid exercise of the police power: Rohrer v. Milk Control Board, 322 Pa. 257. The present Act, so far as constitutional questions are concerned, is well within our prior decision, and we need not concern ourselves with that question at this time." (Italics supplied.)

In Harrisburg Dairies, Inc. v. Eisaman et al., 338 Pa. 58 (1940), the Supreme Court upheld the bonding provisions of the act as a valid exercise of the State's police power. At page 60 it said:

"Appellant having made out a prima facie case, this Court sustained the court below and remanded the case for a determination, after hearing, as to whether, *having regard to the actual circumstances surrounding the State's milk industry, the bonding provision of the*

*act bears such reasonable relation to the preservation
and continuation of an adequate supply of pure milk,*
the purpose asserted by the Legislature to be accomplished, *as a constitutional exercise of the police power
requires. . . ."* (Italics supplied.)

. And at page 63:

"The findings of the court below relative to the
actual conditions and circumstances presently prevalent *within the State's milk industry* in all respects
confirm the legislative findings, . . ." (Italics supplied.)

From all the foregoing it follows that the producers
mentioned throughout the act, and for whose benefit
and protection the price-fixing and bonding provisions
of the statute were included, are Pennsylvania producers.

No citation of authority is required to demonstrate
that a statutory bond must be construed to sustain the
statutory purpose.

The amici curiæ rely on the language of a portion
of section 502, as amended, of the Milk Control Law,
supra, to support their contention that the bonding
provisions of the act are for the protection of all producers selling milk to Pennsylvania dealers. That portion reads as follows (31 PS §700j-502) :

"Milk purchased, acquired or received by a milk
dealer or handler from producers outside the Commonwealth and sold or distributed by such dealers or
handlers as fluid milk within the Commonwealth, shall
be included in computing the amount of such dealer's
or handler's bond, except where such dealer or handler
has filed a bond for the protection of such producers
with the state wherein the milk is purchased, acquired
or received or with such producers. In such computation, the amount due for such milk shall be determined
according to any applicable official prices or any lawful
contract price."

In order to understand this language it is necessary to refer back to that part of section 501, supra, which reads:

". . . Except as otherwise herein provided, the bond shall be in a sum equal to the value of the highest aggregate amount of milk purchased, acquired or received by the dealer or handler from producers in any one month during the preceding calendar year, which value shall be computed according to lawful prices, and shall not in any event exceed one hundred thousand dollars ($100,000.00). . . ."

Reading the two sections together, it is clear that section 502 merely modifies section 501 by providing a method for computing the amount of a Pennsylvania dealer's bond where he purchases milk from out-of-State producers but does not file a bond for their protection in the State where the milk is purchased. Unquestionably, the legislature foresaw that in such cases the dealer's sources of milk would continually vary, that the ratio of out-of-State producers to Pennsylvania producers would not remain the same, and that, under such circumstances, in order adequately to protect Pennsylvania producers it was necessary to include all milk purchased from out-of-State producers in determining the amount of the bond.

The foregoing is the only reference in the entire act to out-of-State producers. Certainly, as indicated above, the legislature did not painstakingly set up a system for the control and regulation of the milk industry in this Commonwealth and for the protection of Pennsylvania producers, only to subsequently change the entire tenor of the act by the wording of this one section. Furthermore, the very fact that here the legislature specifically referred to out-of-State producers is an indication that in every other instance it was concerned with Pennsylvania producers only.

We have considered the remaining contentions advanced in opposition to our conclusion, but find in them no merit warranting discussion.

Accordingly, we hold that the surety is not liable on its bond in the amount due Maryland producers.

And now, April 30, 1948, judgment is hereby directed to be entered in favor of the Milk Control Commission and against the Seaboard Surety Company in the sum of $34,629.74, the amount due Pennsylvania producers.

The claim of $21,189.56, representing the amount due Maryland producers, is hereby denied.